CHAPIN–SACKS MFG. CO. v. HENDLER CREAMERY CO. et al.

(District Court, D. Maryland. March 16, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ☜3(4)—MARKS SUBJECT OF OWNERSHIP —DESCRIPTIVE WORDS.

The words "the velvet kind," as applied to ice cream, *held* so far descriptive as not to be subject to exclusive appropriation as a trade-mark by one manufacturer, on evidence showing that the identical words had previously been used in the same trade by other manufacturers in various places in the United States as indicative of some desirable quality in their product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 7; Dec. Dig. ☜3(4).]

2. TRADE-MARKS AND TRADE-NAMES ☜70(1)—UNFAIR COMPETITION—IMITATION OF NAMES AND PACKAGES.

The adoption by defendant, an ice cream manufacturer of Baltimore, of the same brand, color of tubs and wagons, and style of advertising signs as those in previous use by complainant in Washington, *held* not legally objectionable, so long as their use was confined to Baltimore, where the complainant did no business, although defendants' product was inferior to complainant's, but to constitute unfair competition when used in other cities or towns, where the parties came into active competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ☜70(1).]

In Equity. Suit by the Chapin-Sacks Manufacturing Company against the Hendler Creamery Company and L. Manuel Hendler. Decree for complainant.

Isaac Lobe Straus, of Baltimore, Md., and Walter A. Johnston and. Edward G. Siggers, both of Washington, D. C., for plaintiff.

John Watson, Jr., and Jacob M. Moses, both of Baltimore, Md., for defendants.

ROSE, District Judge. The Chapin-Sacks Manufacturing Company is incorporated under the laws of Virginia. It will be called the plaintiff. One of the defendants is a citizen of Maryland. He will be referred to by his surname. The other is a Maryland corporation. It will be designated the Creamery Company. In March, 1912, it succeeded to Hendler's business. He is its president and the active man in its management.

[1] The plaintiff originally made ice. It thought it could profitably use some of its output in the manufacture of ice cream. It made up its mind to call its product "the velvet kind," because, as one of its officers testified, those words were in keeping with the kind of cream it intended to put upon the market. It began to make ice cream in the spring of 1905. In December of that year it filed an application which ultimately resulted in the registration under the .federal law of the words "the velvet kind" as its trade-mark.

Defendants also call their ice cream "the velvet kind." Hendler did not begin the use of that phrase until some months after the plaintiff had adopted and extensively advertised it. It was, indeed, such use and advertisement that suggested it to him. In addition to a charge of unfair competition, to be considered subsequently, the plaintiff says

that defendant infringes its trade-mark.  Defendant replies:  The plaintiff has no trade-mark, because the words "the velvet kind," as applied to ice cream, are so far descriptive that they cannot be appropriated to the exclusive use of any one maker or dealer.

Plaintiff admits that the words "the velvet kind" are suggestive that the ice cream to which they are applied possesses a desirable quality, but it says that they are not so far descriptive that they may not be made a trade-mark.  One may make a trade-mark out of a name or phrase which has some element of suggestion about it.  "Ceresota" is a good trade-mark for flour, although perhaps it is made up by the addition to the name of the goddess of grain of the last two syllables of the three hard wheat states of Minnesota and the Dakotas. Northwestern Consolidated Milling Co. v. Mauser (C. C.) 162 Fed. 1004.  But no one, by marking his flour "Splendid," could prevent others from describing theirs by the same word.  Ex parte Stokes, 64 O. G. 437.

Such extreme cases are valuable only as illustrating the principle. They give little help when the question is as to words or phrases much nearer the line.  No useful purpose would be served by an analysis of the cases cited by the plaintiff.  The particular atmosphere of each case, and the personal equation of the judge who decided it, play their part.  Some words which have been held descriptive will not appear to every one to be as much so as others which other judges have said were merely suggestive.  Some cases on which the plaintiff relies, such as that of Consolidated Ice Co. v. Hygeia Distilled Water Co., 151 Fed. 10, 80 C. C. A. 506, are not in point, because the court there concluded that the word in dispute, viz.  "Hygeia," had not found a place in our vocabulary as a word of descriptive or qualifying import.  In the present case, the lexicographers and the evidence of the trade show that "velvet" had, long before its attempted appropriation by the plaintiff, been used as such a word.  In one of its secondary meanings it had been recognized as a synonym for softness and smoothness.  One of the cases cited is Albers Bros. Milling Co. v. Acme Mills Co. (C. C.) 171 Fed. 989.  The court there stated that, while the word "cream" as applied to rolled oats did not seem descriptive, if in point of fact, before its adoption by the plaintiff as its trademark, the word had been regarded as descriptive by the trade, the plaintiff could not have acquired any exclusive right in it.  The evidence is very clear that the ice cream trade, both before and since the spring of 1905, have considered the word "velvet" as descriptive of certain desirable qualities of ice cream.  Before plaintiff tried to make a trade-mark out of the word "velvet," or the words "the velvet kind," the former had been used as descriptive of ice cream by the Detroit Creamery Company, the Peoria Wholesale Ice Cream Company, by a maker of ice cream in Marshfield, Wis., and by another at Erie, Pa.

Plaintiff says that it is not shown that any of those persons attached those words to the ice cream itself, or to the containers in which it was sold, and it therefore argues that such uses did not constitute valid anticipations of its mark.  The evidence shows that before plaintiff called its cream "the velvet kind" the Detroit Creamery Company

affixed to the tubs in which it sold ice cream the words "velvet brand." The evidence is probably sufficient to show that the Peoria Wholesale Ice Cream Company did as much with the word "velvet." Nevertheless the acquirement of a valid trade-mark by an ice cream maker in Detroit and by another in Peoria would not, if their trade was strictly limited to those cities and surrounding territory, prevent the subsequent acquirement by the plaintiff of a good trade-mark in the same words for Washington and its vicinity. Hanover-Star Milling Co. v. D. D. Metcalf, 239 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. ——.

But that is not the question now under consideration. The use of the word by so many and by so widely scattered concerns in connection with ice cream is evidence that in the trade it was then understood and used as descriptive of a quality which was sought in that article. The general use before and since of the word for that purpose is abundantly brought out in the testimony. The evidence shows that, in addition to its use by the plaintiff and the defendants, it is or has been used in 41 different towns or cities, distributed over 20 states and one province, from New York to Texas, and from Manitoba and Wyoming to Florida. The word has now, to universal acceptation, become descriptive of ice cream. Few or none of the concerns which are using the word, however late their use of it began, are in any wise competing with the plaintiff, either fairly or unfairly. It has never attempted to sell its product where they sell theirs. If the record did not show, as it does, that in the ice cream trade the word "velvet" had become descriptive of certain kinds of ice cream before the plaintiff went into the ice cream business at all, nevertheless that word is now so. Plaintiff has known the trade usage in this respect, and has not attempted to check it. It is now too late for the plaintiff to assert exclusive rights, if it ever had any. Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60.

Plaintiff points out that the Patent Office has allowed some 60 registrations of the word "velvet" as a trade-mark for various things. In some, perhaps in the majority, of these cases there can be no question that the ruling was right. Where velvet is applied to grate bars, furniture casters, bricks, etc., it is scarcely suggestive. It is certainly not descriptive. In others of the cited cases, the question is a closer one. Registration actually was granted to this particular plaintiff for these very words. The Patent Office has great practical experience in dealing with such matters. Its conclusions are presumptively correct. They should not be lightly disregarded; but the evidence that in this particular trade, at least, the words had become so far descriptive before plaintiff sought to appropriate them that they could not be put to its exclusive use, is in my view so conclusive that it must override any presumption arising out of the action of the Patent Office.

The conclusions stated dispose of so much of plaintiff's case as rests upon its claim to the possession of a valid trade-mark. But that does not necessarily end the matter.

[2] Plaintiff charges that, irrespective of whether it has or has not a good trade-mark, defendants have unfairly competed with it. Hendler was living in Washington in 1905. His father had been in the dairy business in or near Baltimore. The words "the velvet kind," as

displayed by the plaintiff, attracted his attention. He seems to have appreciated their advertising value. He returned to Baltimore toward the close of the year named, and began preparations to go into the ice cream business. He made up his mind that his ice cream also should be called "the velvet kind," and when, at the opening of the season of 1906, he began to put ice cream on the market, he called it "the velvet kind," and he and the Creamery Company have continued to do so ever since. In the color of his tubs, in the painting of his wagons, the character of his signs, and the methods of his advertising he followed the plaintiff. The resemblance in all of these respects is close. Yet there is no reason to believe that when he first gave the name "the velvet kind" to his ice cream, or when he copied plaintiff's methods of advertising and marketing its wares, he was trying to filch its trade. He began his business in Baltimore, and in that city and its immediate suburbs he and his successor have always sold much more than nine-tenths of all the cream they made. Neither of them has ever sold, or ever tried to sell, any in Washington. On the other hand, plaintiff has never sought trade in Baltimore, and in point of fact has had none there. It may possibly, on a very few occasions, at the request of some individual in Baltimore, have shipped ice cream to him; but even so much is scarcely established, and, if it were, it would be one of those very small things of which the law proverbially takes no notice. Hendler followed plaintiff, not for the purpose of stealing plaintiff's trade, but merely because imitation was easier than invention.

It is scarcely possible to hold one guilty of unfair competition in markets in which there was no competition at all. It is true that the record shows that defendant's cream is even now poorer in quality than that of plaintiff. It still contains on an average of 10 per cent. less butter fat, and it is now admittedly of a better quality than it formerly was. Scientific tests of the two creams, moreover, show that as a result, doubtless, of more careful methods of manufacture, plaintiff's is a cleaner ice cream, and contains markedly fewer bacteria.

Plaintiff says that Baltimore and Washington are distant from each other but 40 miles in space, 45 minutes in time, and that the residents of one are frequently in the other, so that the reputation of its cream in Washington is impaired by the fact that a cream sold under the same name in Baltimore is an inferior article. Some such results are conceivable, but it hardly seems possible that they can be realized to an extent sufficient to make them of any practical importance. Defendant's cream is the poorer cream, yet in Baltimore it has a large and rapidly growing sale. Its defects, whatever they are, are not apparent to every one's taste, and in Annapolis, in which it will be presently seen the two creams come most sharply in competition, the largest retail dealer, and the one whose trade can best afford to be particular as to quality, sells defendant's exclusively. It must be remembered that, if plaintiff has not a trade-mark in the words "the velvet kind," it does not even claim to have any exclusive rights in the color of its tubs, the shape, color, and general appearance of its wagons, or its advertising signs. It is true it has the right that no man shall use any of these things to sell his goods to people who want its, but for any other purpose all the world is free to use any or all of them. In Balti-

more and everywhere else in which defendant sells its goods at all, except in Annapolis and Laurel, there is no chance of defendant taking any of plaintiff's trade, for plaintiff has never had any, and apparently never wanted any.

There has been competition in Annapolis and Laurel. Each of these places is about equally distant from Baltimore and from Washington. Did the defendants in them compete unfairly with the plaintiff? It is probable that Hendler's ice cream was sold in Annapolis before plaintiff's. It is possible that the tubs in which it was there shipped may have been marked "the velvet kind"; but, even if that much be admitted, Hendler's sales were insignificant in quantity, and there was at that time no advertisement of his cream as "the velvet kind." Plaintiff's business in Annapolis was the direct outcome of the high reputation for cleanliness and careful manufacture it had already established in Washington. It began in 1908. In that year it sold 1,005 gallons. The demand grew rapidly, and the sales of 1910 were nearly six times as great. In that year Hendler for the first time made any serious attempt to do business in the capital of Maryland. He then engaged a very capable and energetic agent. He sold 873 gallons. That was between one-sixth and one-seventh of plaintiff's sales the same year. In the next three years his and his successor's business grew so that in 1913 the latter sold 4,500 gallons more than he had three years before. In the same period plaintiff's sales increased 14,400 gallons.

At the beginning of 1914 plaintiff announced an increase of 15 cents a gallon in the price of its cream. Its customers, as those of the defendant, were retail dealers. Most of them refused to pay the increased price, when they could get another velvet kind for the old, and even, as it turned out, for less. The Creamery Company saw its opportunity. It put a delivery wagon on in Annapolis, offered to deliver, pack, ice, and salt its cream and keep it, while in the possession of the retailer, iced and salted, free of charge. This amounted to a reduction of some cents a gallon. It for the first time advertised its ice cream in the Annapolis papers as "the velvet kind." Plaintiff soon reduced its price to its former level, but the damage had been done. In 1914 it lost nearly two-thirds of its trade. The Creamery Company more than doubled its. In 1913 the plaintiff sold nearly four times as much as the Creamery Company; in 1914, but little more than one-half as much. Plaintiff's sales fell off 13,000 gallons. The Creamery Company's increased 8,300 gallons. Some, if not all, the difference between what the plaintiff lost and the Creamery Company gained went to swell the trade of other dealers, who did not call their ice cream "the velvet kind." In 1915 plaintiff recovered about two-fifths of the ground it had lost. The Creamery Company held the greater part, but not quite all that it had gained. In that year the sales of the two creams in Annapolis were nearly equal, the plaintiff having a little the best of it.

When Hendler began to press his sales in Annapolis, he was bound to remember that he had taken the name that plaintiff gave its cream, and had followed it more or less closely in the way of advertising and

marketing. He had the right to do so when there was no danger of thereby leading people who wanted plaintiff's cream to buy his. Under the conditions which prevailed in Baltimore, there was no occasion to take precautions against dangers that did not exist, but where he was in active competition with plaintiff, as at Annapolis, the situation was different. He had unnecessarily, and merely to save himself the trouble, so carried on his business that, in any locality in which both creams were sold, confusion with plaintiff's goods was highly probable, if not inevitable. He and his successor have found such confusion useful in taking trade away from plaintiff. Under such circumstances he was bound, at his peril, to prevent it. All experience shows that, in an article of this kind, the mere fact that he displayed his own name in connection with the ice cream was not sufficient to keep people from buying his wares when they wanted plaintiff's. Defendants, it is true, have a right to say their cream is "the velvet kind," precisely as they have the right to paint their tubs yellow, to use similar delivery wagons, to furnish their customers with cabinets which closely resemble those of plaintiff, and to display signs and banners which make almost the same impression on the eye as do those of the plaintiff; but they cannot do one, or all, or any, of these things for the purpose of confusing their goods with those of plaintiff's. This is especially true when their goods are to their knowledge inferior to its. If Hendler had taken the trouble originally to design an advertising scheme, instead of appropriating that of plaintiff, the defendants would not now be subject to any embarrassment. He did not, and they must submit to whatever is necessary to protect plaintiff from the annoyance and loss resulting from a confusion which they have caused.

Laurel apparently furnishes a much smaller market for ice cream than does Annapolis. Defendants' competition, while smaller in amount and less systematic in character, is carried on at Laurel in the same way as in Annapolis, and must fall under like condemnation.

The filing in one of the equity courts of the state of Maryland in 1910 of a bill against Hendler, charging trade-mark infringement, and a failure to press the case, so that the bill was dismissed for want of such prosecution, is not a bar to this suit; certainly not to the granting of the limited relief to which plaintiff has been found entitled.

A decree will be entered which will so restrain defendants in their ways of advertising, marking, and selling their cream in Annapolis, in Laurel, and in any other places in which the plaintiff, prior to the institution of this suit, was selling its cream, as will remove all reasonable danger of defendant's cream being sold as plaintiff's, or under the reputation acquired by plaintiff. The terms of such decree, if the parties cannot agree upon it, will be settled at an early date.

In view of the fact that the relief asked by plaintiff was much broader than that to which it has been found entitled, and that a considerable part of the costs were incurred in a contest over the claim of the plaintiff to that which has been denied, the decree will require each party to pay one-half the costs.