Lennox Furnace Company, Appellee, v. Wrot Iron Heater Company, Appellant.

**TRADE-MARKS AND TRADE NAMES:** Unfair Competition—
1. Fraudulent Duplication of Article. The manufacture and sale, in competition with a prior manufacturer, of an unpatented article of the same size, form, shape, material, and functional parts as that of such prior manufacturer, do not necessarily constitute unfair competition, even as to one who, by prior manufacturing and making, has acquired a valuable reputation and good will therein; but such duplication will constitute such unfair competition and become enjoinable, provided the duplication is *fraudulent* because so executed, advertised, and marketed as to *deceive* ordinarily prudent persons into believing *that the duplicated article is that of such prior manufacturer.*

PRINCIPLE APPLIED: The Lennox Furnace Company had, for 15 years, manufactured and, through advertising agencies and dealers, sold, under the name of "Torrid Zone," an all steel furnace. The furnace body was made of steel; was cylindrical; had an oval top, a certain size and shape of radiator, a cast-iron front, an oval door,—upon which appeared the words "Torrid Zone," along with the statement that it was made in Marshalltown, Iowa,—and a rope ornamental border. The expense attending the development of this type of furnace had been large; but an extensive market had been built up in numerous states, and the form, style, pattern, name, reputation, and good will of said furnace had become valuable to said company.

Near the close of this 15-year period, the Wrot Iron Heating Company was organized. It employed one of plaintiff's old pattern makers, and instructed him to secure parts of plaintiff's furnace and to make patterns so exact that they would fit plaintiff's "Torrid Zone." The patterns so made and the parts manufactured therefrom did fit the "Torrid Zone" furnace within 1-1000 of an inch. The result was a furnace with a body made of steel, cylindrical, and of the same diameter as a "Torrid Zone," with an oval top, the same size and shape of radiator as the "Torrid Zone," a cast iron front, an oval door, upon which appeared the words, "Type A Wrought Steel Furnace," and a plate, showing that the furnace was made by the Wrot Iron Heater Company, of Des Moines, Iowa. The rope border was omitted.

In addition, the defendant employed one of plaintiff's old employees, who was familiar with the character, kinds, and qualities of plaintiff's furnaces, and thereby secured knowledge of the plaintiff's agencies, customers. price lists, and terms of sale. It also secured from one of plaintiff's agents a photograph of a "Torrid Zone" furnace, and therefrom made a cut, and used it upon its advertising matter, under the name of "Type A Wrought Steel Furnace." Defendant's advertising matter practically duplicated plaintiff's price list. The defendant then carried on extensive propaganda among plaintiff's dealers, agencies, and customers, they being told that defendant's furnace was a duplicate of plaintiff's "Torrid Zone;" that it sold for less money; that defendant's furnace could be sold without people's knowing the difference between it and a "Torrid Zone;" that a dealer could take off the front of a "Torrid Zone" and replace it with the front of defendant's furnace, and no one would detect the change. Some of plaintiff's dealers were told that, unless they handled defendant's furnaces, defendant would sell them to competitors, who would be able to deceive their customers into the belief that the customer was getting a "Torrid Zone." Defendant attempted to induce some of plaintiff's employees to quit plaintiff and to sell defendant's furnaces, defendant explaining to the agent how the "Torrid Zone" could be remodeled with defendant's fittings so that no one would detect the change.

Defendant's conduct resulted in great confusion and disturbance of plaintiff's business, and greatly injured plaintiff's reputation and trade.

*Held*, defendant's duplication of plaintiff's furnace, *plus* its conduct in placing the same upon the market, constituted unfair competition, and defendant should be enjoined from selling such duplication in plaintiff's already-acquired territory.

**INJUNCTION:** Scope of Relief—Competition. An injunctional order prohibiting certain unfair competition *"in all other localities in which the plaintiff is advertising and selling"* a certain type of furnace, if subject to the vice of being indefinite and uncertain, is cured, under the record, by striking out the words, "advertising and."

*Appeal from Polk District Court.*—C. A. DUDLEY, Judge.

DECEMBER 16, 1916.

REHEARING DENIED DECEMBER 14, 1917.

THIS is an action in equity, to restrain defendant from carrying on unfair trade and from continuing unfair competition, as plaintiff alleges. In the action, an application for a temporary writ of injunction was made, and a hearing had thereon. This appeal is from an order of the district court granting a temporary restraining order. The defendant appeals.—*Affirmed.*

*Orwig & Bair* and *Parker, Parrish & Miller,* for appellant.

*Clark, Byers & Hutchinson* and *R. P. Thompson,* for appellee.

1. TRADE-MARKS AND TRADE NAMES: unfair competition: fraudulent duplication of article.

PRESTON, J.—Upon the hearing of the application for a temporary writ, witnesses were produced and testimony taken in open court by both sides; and, although the hearing was not on the merits, the record is full and complete. The following is a cut of plaintiff's furnace.

And the following, which plaintiff alleges is, in some particulars, an exact duplicate of its furnace, is a cut of defendant's furnace.

## Type "A" Ideal Wrot Steel Furnaces
### A BETTER STEEL FURNACE FOR LESS MONEY

Plaintiff alleged in the petition that it is a corporation engaged in business at Marshalltown, Iowa; that it manufactures an all steel furnace, under the name of the "Torrid Zone;" that it has been engaged in the manufacture and sale of such furnace since about 1901; that it has been selling, by advertising and through agencies and dealers, an all steel furnace of a distinctive type, under the name of "Torrid Zone" aforesaid, and, by the expenditure of large sums of money and years of effort, had acquired a large trade in its furnaces in the states of Iowa, Ohio, Wisconsin, Michigan, Kansas, Texas, Minnesota, Pennsylvania, Indiana, Illinois, Missouri, Oklahoma, Nebraska, North Dakota and South Dakota, and trade with jobbing interests at Denver, Colorado, and along the Pacific coast;

that plaintiff had built up a business with an average annual output of something like 5,000 furnaces; that the defendant, by unfair methods, commenced in about the year 1916, was seeking to take from the plaintiff its trade and the reputation of its furnace, and in furtherance of said effort was interfering with plaintiff's agencies and dealers, and was putting upon the market a furnace that was an imitation of plaintiff's furnace, and so constructed and put together and dressed up that it could be and was being taken and purchased for plaintiff's furnace; that such conduct, together with other unfair methods, amounted to unfair competition; that plaintiff had built up a large trade and established a valuable good will and reputation for said "Torrid Zone" furnace; that the form, style and pattern of said furnace, as well as the reputation and name and the type and construction thereof, have become and are now a valuable property right of the plaintiff's.

Many of the allegations of plaintiff's petition are admitted in the answer. At the conclusion of the hearing, the trial court granted a temporary writ, in which it was found that the allegations of plaintiff's petition and amendments were true, and ordered:

"It is therefore ordered that the defendant, the Wrot Iron Heater Company, be, and it is hereby, strictly enjoined and restrained from the manufacture for sale, or sale, or the advertising for sale, of its Type 'A' furnace in its present form, or any furnace of any other name, which is an imitation or duplication of plaintiff's Torrid Zone furnace; and from the manufacture for sale or sale of a steel-riveted furnace, which is a facsimile of the Torrid Zone furnace made by the plaintiff; and from making for sale, advertising, selling, or offering to sell, furnaces which are imitations of plaintiff's Torrid Zone furnace; and from interfering with the trade and agencies of the plaintiff, all of which acts, conduct, and things, the defendant is re-

strained and enjoined from doing in the states of Iowa, Ohio, Wisconsin, Michigan, Kansas, Texas, Minnesota, Pennsylvania, Indiana, Illinois, Missouri, Oklahoma, Nebraska, North Dakota, South Dakota, Colorado, California, Oregon, Washington, and in all other localities in which the plaintiff is advertising and selling its Torrid Zone furnace."

After the order was made, application was made to the trial court for a reargument, which was granted, and an answer was filed and the application again fully argued. There is some confusion in the dates in the abstract and additional abstract; but, as we understand it, the original order was modified on the reargument, the court stating that, upon the authority of *Sartor v. Schaden,* 125 Iowa 696:

"It is now apparent that the conclusion which I stated as to the breadth of the injunction should be modified, and the injunction will issue as determined in the original opinion and apply in all cases wherein the plaintiff is doing business,—that is, is selling its furnaces. This does not interfere with the right of the defendant to sell its furnaces in localities in which the plaintiff is not doing business."

We may refer to some of the more important facts shown by the record, many of which are not disputed. As to others, there is more or less conflict. From an examination of the record, we are satisfied with the findings of the trial court. It is not our purpose to go into the evidence in detail. The bodies of plaintiff's Torrid Zone and defendant's Type "A" furnaces, cuts of which have been before set out, are made of steel, and formed by hydraulic or other pressure. The fronts are cast, and are formed from patterns. Some of plaintiff's witnesses say that, prior to the time plaintiff commenced to make the Torrid Zone, there were being manufactured sheet metal or steel-bodied fur-

naces, cylindrical in form, having the same diameter as plaintiff's furnace, and with an ordinary rounded or dome-shaped form for a head, but not of the exact size of plaintiff's furnaces; that there was on the market what one of said witnesses called standard size heads, which were kept in stock and could be bought by anyone; that the bodies and heads of plaintiff's furnaces were different from the bodies and heads on the market, in that there was more or less variation between the standard sizes and those manufactured by plaintiff, depending on the size of the furnace; that the heads of plaintiff's furnaces were dished more than some and less than others, but not exactly the same as any he knew about.

There is testimony that some of the distinctive features of plaintiff's Torrid Zone furnace are as before stated; that the body and the front which is placed upon it have certain proportions different from the ordinary furnace, different from any other except the Torrid Zone, and that the ornamentation is different; that there is a difference between the radiator of plaintiff's furnace and other furnaces. Without going further into specific matters claimed as distinctive features, we may say that the general make-up and outline and dress of the furnace are distinctive.

The evidence shows that, since 1901, plaintiff has sold a large number of the Torrid Zone furnaces, and at this time is averaging 4,000 or 5,000 a year; that the furnaces are sold through advertising and by dealers and agencies throughout the country, and especially in the states before mentioned. That, during the years since 1901, plaintiff has built up a large trade in these states, and established a valuable good will and reputation for its furnace. The form, style, and pattern of the furnace, as well as the reputation, name, and type of construction, have become and are now a valuable property right of the plaintiff's. Prior to 1915, plaintiff manufactured at its factory, for the man-

ager of defendant company, a number of steel furnaces. Thereafter, and prior to the first day of January, 1915, the said manager, Mr. Howard, promoted and organized the defendant company, and after its organization, employed and took into its service one of the former employes of the plaintiff, who was in a position to familiarize himself with the character, kinds and quality of the furnaces being sold by the plaintiff and with the price lists therefor, also with the plaintiff's agencies and customers throughout the several states before referred to; that through said employe the defendant company acquired knowledge and information with respect to the plaintiff's business, its agencies throughout the country, its customers, and the names of dealers who were selling plaintiff's furnaces, as well as information with respect to terms and conditions under which plaintiff was selling its furnaces, and secured from said employe price lists and other similar information about the business of the plaintiff; that it also secured from one of the agents of the plaintiff photographs of plaintiff's Torrid Zone furnace, and, with these photographs and the catalogue of the plaintiff, it had printed a large number of folders for advertising purposes, in which folder there appeared, under the name of "Type 'A' Wrought Steel Furnace," an exact duplicate of plaintiff's Torrid Zone furnace; in fact, the cut in the folder was made from the photograph of plaintiff's furnace, just referred to. In this folder there also appeared a substantial duplicate of plaintiff's price list. Defendant employed one Tumpach, who for many years was the pattern maker for the plaintiff company, to make patterns for defendant's Type "A" furnace, defendant instructing Tumpach to secure parts of the Lennox Torrid Zone furnace, and from such parts to make patterns like the Lennox patterns, in so far as to insure that the parts would fit the corresponding sizes of Lennox Torrid Zone fur-

naces. The defendant company then, with the folders and catalogue before referred to, began an extensive advertising campaign, not only through the mails, but by traveling salesmen and agents, among the dealers and agencies of the plaintiff, using the lists and other information secured from the former employe of the plaintiff. These traveling salesmen and agents of the defendant represented and stated to plaintiff's dealers and agents that they were manufacturing and putting out a duplicate of plaintiff's Torrid Zone furnace, which could be sold for less money, and which the ordinary buyer would not be able to tell from the plaintiff's Torrid Zone furnace, in many instances suggesting to plaintiff's dealers and agents that their customers would buy defendant's Type "A" furnace and never know that they were not getting a Torrid Zone. It was also suggested to plaintiff's dealers that, if they had on hand Torrid Zone furnaces, and did not want to handle two lines, they could simply change the doors and make them all Type "A" furnaces. In its advertising matter, it claimed that its parts would fit the parts of the Torrid Zone within 1/1000 of an inch. These methods soon resulted in great confusion and disturbance of plaintiff's business with its dealers and agencies, and interfered with plaintiff's trade, the reputation of its Torrid Zone furnace, and the good will of its business throughout the territory before referred to: hence this action. Other facts may be referred to later in the opinion, in the discussion of different points.

Appellant has assigned errors. The first is that the court erred in enjoining defendant from the manufacture for sale, or sale, or advertising for sale, of its Type "A" furnace, in the following particulars: (a) Defendant's Type "A" furnace was like the plaintiff's Torrid Zone furnace only in that it was cylindrical in form, with an oval top, a similar front and radiator, and made of the same material, and it was not similar to the plaintiff's

furnace in respect to dress, markings, or other indicia of origin; (b) there was nothing about the shape, style, dress or markings of the defendant's Type "A" furnace that would tend to or did cause purchasers to buy the same believing that it was a furnace manufactured by the plaintiff.

It is also contended that the court therein erred for the reason that the evidence did not show that defendant was intending to manufacture for sale, sell, or advertise for sale, any furnace which was an imitation, duplication, or facsimile of the plaintiff's said furnace; that the defendant had the right to sell to the trade and agencies of the plaintiff any article of commerce, so long as the doing of the same did not constitute unfair competition, and, further, that the testimony failed to show that the plaintiff had acquired a trade and reputation for its said furnace throughout the states mentioned.

The trial court found against the defendant on these several propositions, and, as stated, we are satisfied with the trial court's finding. It is also assigned as error that the court erred in enjoining defendant from doing the things mentioned "in all other localities in which the plaintiff is advertising and selling its Torrid Zone furnace," for the reason that the same was indefinite and uncertain, and because the evidence did not show in what, if any, other places or territory the plaintiff had acquired a reputation for its goods.

1. It should have been stated that plaintiff, having adopted for the name of its furnace the words "Torrid Zone," placed the same on the door of the furnace; also the statement that the furnace was made by the Lennox Furnace Company, of Marshalltown, Iowa. Defendant placed the name it had adopted for its furnace on the doors thereof, and also placed a plate on the furnace showing that it was manufactured by the Wrot Iron Heater Company,

of Des Moines, Iowa. There is a rope border around the front of plaintiff's furnace. This, of course, was a mere ornamentation. Defendant, in the manufacture of its furnace, eliminated the rope border.

Appellant states the proposition in this way: That the question is whether or not the defendant is engaged in unfair trade because it makes and sells, in the same market in which the plaintiff is doing business, a furnace which is made of the same material as plaintiff's furnace, is circular or cylindrical in form, as is the plaintiff's furnace, has the same diameter as the plaintiff's furnace, has an oval door, as has the plaintiff's furnace, has a radiator of the same shape and size as the plaintiff's furnace, and has a cast-iron front, including the doors, like plaintiff's furnace. Their legal proposition at this point is that the plaintiff could not secure a monopoly in the shape, size, or style of its furnace, or the material out of which it was manufactured, and thereby enjoin the defendant from manufacturing and selling in competition with plaintiff a furnace of the same shape, size, style, and material, and that the manufacture and sale of an article of the same size, form, shape, and material as that of a prior manufacturer, in competition with him, does not constitute unfair trade; that unfair trade consists of conduct tending to pass off one person's merchandise or business as that of another; and they say that one may not monopolize the functional parts of an unpatented article. On these propositions they cite our own case of *Motor Accessories Mfg. Co. v. Motor Co.*, 167 Iowa 202; *Rathbone Sard & Co. v. Champion Steel Range Co.*, 189 Fed. 26; *Goodyear Co. v. Goodyear Rubber Co.*, 128 U. S. 598; *Howe Scale Co. v. Wyckoff*, 198 U. S. 118; and other cases.

Appellee concedes that it would have little cause for complaint if appellant had done no more than copy and imitate the parts of appellee's furnace, or even the com-

pleted furnace, and had done all this only for the legitimate purpose of getting for its own use a furnace like the Torrid Zone. But they contend that the defendant has gone far beyond this; that it pirated appellee's patterns, and selected one of appellee's former pattern makers to make patterns as near like the Torrid Zone parts as possible; that it secured from appellee's former employes confidential lists and information about its dealers; that it secured original photographs of the Torrid Zone furnaces, and used them in preparing its printed advertising matter and cuts; that it sought to take from appellee its business and the reputation of its furnaces, by urging upon appellee's dealers the fact that there was no difference in the furnaces, and that, unless appellee's dealers handled their furnace, they would sell it to their competitors, who would, in turn, be able to deceive their customers into believing that they were getting the Torrid Zone furnace; and many other similar acts, none of which can be explained, as plaintiff says, upon any theory of business integrity and fair dealing.

Appellee contends that the vital question is whether appellant has imitated appellee's furnace as to the similar distinctive features, and as to the shape and form and the manner in which the several parts were put together, and then imitated its furnace so as to make it look like appellee's finished furnace, and then, by the other means pursued, which have been enumerated in part at least, attempted to sell its furnace on the reputation of the plaintiff, and attempted to deceive buyers of furnaces into believing that, in the purchase of appellant's furnace, they were buying appellee's.

It is not the mere fact of imitation alone that makes out a case, but the fact of imitation, and perhaps unnecessary imitation, with all the other things shown in the record, that makes out a case of unfair competition. Some of the cases refer to the matter of unnecessary imitation, and

say that by this is meant imitation which is not necessary in order to make the article in the form in which it is commonly made and known, nor to make the article perform the service for which it is manufactured.

Appellee contends, also, that, while one may have a right to imitate certain features of the goods of another, or of the dress or package in which such goods are sold, he cannot do these things so as to deceive buyers of such goods into thinking that they are buying wares of the other party,—citing *Billiken Co. v. Baker & Bennett Co.*, 174 Fed. 829, 831; *Globe-Wernicke Co. v. Brown & Besley*, (C. C. A.) 121 Fed. 90, 92; *Avery & Sons v. Meikle & Co.*, 81 Ky. 73, 94, 95; *National Biscuit Co. v. Ohio Baking Co.*, 127 Fed. 160, 161; *Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.*, 231 Fed. 550, 555 (1916); *Moxie Co. v. Daoust*, (C. C. A.) 206 Fed. 434.

The law is reasonably well settled as to what constitutes unfair trade and competition, and we do not feel justified in reviewing the cases. We shall attempt to state the rules and cite some of the cases. It is largely a question of fact.

In *Motor Accessories Co. v. Motor Co.*, supra, some of the discussion was in regard to trade names and trade-marks; but unfair competition was defined, and we can do no better than to quote. It was there said:

"The disposition of this case does not involve the question of trade names or trade-marks, nor the rights which obtain to patented articles. In the presentation of this case, the plaintiffs rely solely upon the rules heretofore laid down governing unfair business competition, and the determination of this case involves the application of these principles to the facts as we find them in this record. What is unfair competition is a mixed question of law and fact,

and has been variously defined and applied by the courts. It consists in the conduct of a trade or business in such a manner that there is an expressed or implied representation that the goods or business of the one man are the goods and business of another (see 28 Am. & Eng. Encyc. 345, [2d Ed.]), and applies in cases where one simulates the particular device or symbol employed by another in such a way as to deceive the ordinarily prudent person, thereby leading him to believe, by the marks thus simulated, that the goods are the goods of another, and thus practicing a fraud upon the person whose goods he simulates, and upon the general public dealing in those goods. The ground of the action of unfair competition is fraud, and this may be shown by direct testimony, or by facts and circumstances, or inferred from the manner in which the business is carried on. This doctrine is applied in cases where one has established a business under a particular name, or by the use of certain marks or symbols, so that it has become known, in the trade generally, as designating the goods of that person. Courts of equity will enjoin one who fraudulently assumes the same name, device, or symbol for the purpose of stealing away from the other the business so established, and thereby depriving him of the profit which flows from the business. The object of the law is to protect the property rights of a person from invasion by one who fraudulently, by the use of the same devices, symbols, or name, seeks to and does take from him the custom, good will, and the business by him established and maintained. There is no practical way, other than by prohibition, to prevent the filching of trade established by one in an article, through a name, symbol, or mark, than by prohibiting the use of the trade name or mark. Even where the name, symbol, or device used is not one that can be protected as a trade name or mark, equity will protect one in the use of it, where it has, by long use, obtained a

secondary meaning, as designating the goods of one particular person, and where, by the use of it, the public has come to know his goods by that name or symbol. He thereby acquires a property in it which is of value, and which another cannot wrongfully simulate and so deprive him of the benefits of its use."

See, also, *Dover Stamping Machine Co. v. Fellows,* (Mass.) 40 N. E. 105, where it is said that there is no unfair competition apart from the infringement of a patent or trade-mark, unless the competing person so makes or marks his goods or conducts his business that purchasers of ordinary caution and prudence, and not those who are exceptionally dull, are likely to be misled into the belief that his goods are the goods of somebody else. And it is argued by appellant that in the instant case there is no excuse for a reasonably prudent buyer's purchasing defendant's furnace thinking that he is buying one manufactured by plaintiff; but we think otherwise. It is not alone the similarity in appearance, but all the circumstances must be taken into account, the methods and representations and other things shown by the record. See, also, on proposition last referred to, *Singer Mfg. Co. v. June Mfg. Co.,* 163 U. S. 169; *Warren Featherbone Co. v. American Featherbone Co.,* (C. C. A.) 141 Fed. 513; *Geo. G. Fox & Co. v. Hathaway,* (Mass.) 85 N. E. 417; *Yale & Towne Mfg. Co. v. Alder,* (C. C. A.) 154 Fed. 37.

We shall refer to some of appellee's propositions and cite some of its cases without comment. They contend that the simulation or imitation of an article of a prior manufacturer in such a manner as is likely to cause confusion in the mind of the ordinary or usual buyer as to its origin, constitutes. unfair competition (citing 38 Cyc. 756, 767, 773); that the evil is done when the instrumentality of fraud is put into the hands of the dealer, especially where

the article complained of is sold to the local dealer at a lower price than the former, thus, by giving him a greater profit from selling the new article, furnishing an incentive and inducement to fraud and unfair methods in disposing of it,—citing *Forster Mfg. Co. v. Cutter-Tower Co.,* (Mass.) 97 N. E. 749; *Notaseme Hosiery Co. v. Strauss,* 201 Fed. 99 (240 U. S. 249) ; *N. K. Fairbank Co. v. Luckel,* 102 Fed. 327.

Cases are cited to the point that it is not necessary to prove the wrongful intent by direct testimony; that in these cases the fraudulent intent is often inferred from the facts,—citing, among other cases, *Wolf Bros. & Co. v. Hamilton-Brown Shoe Co.,* 206 Fed. 611, 616; *Hartzler v. Goshen Churn & Ladder Co.,* (Ind.) 104 N. E. 34, 39; Nims on Unfair Competition, Section 30.

Appellees state that they claim no exclusive right to manufacture and sell an article that is strictly mechanical and functional in every feature, and concede that in such case it would be necessary to secure a patent, and appellee says that they do not claim the exclusive right to manufacture an article in a particular form or shape which is not made or known in any other form or shape, as illustrated in some of the cases cited by appellant, among them *Warren Featherbone Co. v. American Featherbone Co.,* supra. Further, appellee admits defendant's contention that, to be entitled to injunctive relief, it must show that it has established a market for its Torrid Zone furnace; otherwise it could have no reputation or good will, with respect to that particular furnace, for which it claims protection; and they claim that they have so shown as to the states named. The trial court so found, and we are of opinion that the evidence justifies such a finding.

A number of circumstances are shown in the record, tending to show fraudulent conduct on the part of defendant

in the manufacture and sale of its furnace in competition with plaintiff's. We shall refer to only a few of these. One witness testifies that a representative of defendant company called upon him in the spring of 1916, and that he heard defendant's representative say that his prices on the furnace and repairs were lower, and that, from what defendant's representative was saying:

"It sounded like he was selling it on the same merits as the Torrid Zone furnace. He had a cut there that was like the one in the Torrid Zone catalogue. We were looking at it, and he saw we were kind of puzzled over it to see what the difference was, and he said in a kind of joking way that they stole or infringed that. He also said that the furnace company had some old employes of the Lennox people with them."

Another witness, a salesman in the employ of plaintiff company, testified that defendant's manager tried to get him to quit plaintiff, and go out and sell defendant's furnaces at lower prices than the plaintiff was getting for theirs, saying that he could quote any customer 10 per cent below the Lennox cost, and, further:

"He said I could tell them they were interchangeable —that the castings would interchange with any on the Lennox Torrid Zone furnace. He said, where we had some Lennox furnaces on the floor,—Torrid Zones,—we could change the name—the name plate—on them and put his right over it, and sell them just as though they were the Wrot Iron Heater Company's."

Another witness testifies that defendant's manager gave him a cut of their furnace, and, as the witness puts it:

"He went on to explain to me, as near as I can tell it, that their furnaces were so near like the Torrid Zone furnace that the ordinary man could not tell the difference. * * * While, he says, you would not be selling the

Lennox furnace, you would be making more profit. He figured that on an ordinary job of heating there was $17 more profit on this furnace than on our own, and also explained that the different parts of this would fit the Lennox furnace, and explained why he could sell it cheaper. The cut looks like the Torrid Zone furnace I had on the floor. I must say that I cannot see any difference in them at all."

He also says that defendant's manager, Howard, told him that the Type "A" furnace "could be sold just the same, and the ordinary man couldn't tell the difference."

Another witness testified that one of defendant's salesmen called upon him in the early summer of 1916, and told him that defendant's Type "A" furnace was in all respects like the Torrid Zone: the parts could be interchanged, and it could be substituted for the Torrid Zone in placing it on the market, and it was in all respects the same thing; the repairs on one furnace would fit the other.

"He also offered to put my name on it in place of the Torrid Zone name, or their name, whichever the case might be. What he did claim was that his furnace was identical with it in respect of construction; so near like the other furnace that an ordinary customer could not discern the difference between them. He said that they could be substituted for the Torrid Zone furnace; that they were so near like the Torrid Zone furnace that the ordinary person could not tell any difference in them. He said that the parts were absolutely interchangeable; that you could take off the door of the Wrot Iron furnace and put it on the Torrid Zone furnace and that it would fit absolutely; and that, if you had a Torrid Zone furnace and wanted to call that a Wrot Iron, all you would have to do would be to change the doors on them."

Other witnesses gave similar testimony. It may not be amiss to refer to some of the findings and conclusions

of the trial court. The court found in its opinion, among other things, that:

"It is not shown that the necessary and essential functional parts of a steel-riveted furnace are only combined in a furnace constructed as and having the form of the Torrid Zone, nor that the functional characteristics of the Torrid Zone furnace, speaking now of the form and construction of the furnace, are the necessary functional characteristics in form and construction of steel-riveted furnaces. The parts of steel-riveted furnaces are not so necessarily common that they have become standardized, though by design the parts of the Ideal made by the defendant are made to interchange with those of the Torrid Zone to within the thousandth part of an inch. These parts so interchangeable between the furnaces are not shown to be interchangeable with any other steel-riveted furnace, unless such furnace is an imitation of the Torrid Zone furnace, and by virtue of these facts the conclusion is irresistible that imitation or simulation has been made purposely to compete with and supplant the Torrid Zone. * * *

"The evidence does not sustain the contention of defendant that a steel-riveted furnace can only be constructed and have the form of that of the Torrid Zone. * * * Plaintiff has been in business a number of years, and considering its large trade in different states in the furnace Torrid Zone, and in its present form, the plaintiff has gained for itself an excellent reputation as to this particular furnace, and consequently there has come to the plaintiff a certain good will predicated upon both the character and form of this furnace. Now a word or phrase aside from its common use and meaning may by continued use come to have, when applied to articles of manufacture and trade, a secondary meaning which will belong to the person who has developed or applied it; and if this secondary meaning has become established in the public mind, so that the

goods of the one who appropriates and uses the word or phrase have become known and recognized by the public under such word or phrase, the use of the word or phrase will be protected. Appropriation and use furnish, therefore, the secondary meaning of the name, device, or symbol, which is a property right and which has or may have protection. * * * The furnace may not have special particulars to be characterized as distinctive, but, as a steel-riveted furnace as a whole, may have a distinctive 'get up,' 'form,' 'construction,' adopted by the plaintiff for the purpose of distinguishing its furnace from that of other manufacturers. * * * A study of the exhibits shows that, if the doors of the two furnaces were ajar or were off, the public would not be able to detect any difference between the two furnaces."

In the trial court's opinion after reargument, the court said:

"Upon reconsideration of the question, I adhere to the original opinion, except as hereinafter stated, and for the following, among other, reasons:

"(1) Because the Torrid Zone furnace, the furnace manufactured by the plaintiff, in its *ensemble* is specific, not generic.

"(2) To secure commercial success it is not essential that the physical construction and visual appearance of the Ideal furnace should comply exactly with that of the Torrid Zone.

"(3) The construction of the Ideal furnace as an exact duplicate of the Torrid Zone is designed to misrepresent and mislead as to the origin of the Ideal furnace.

"(4) The construction of the Ideal furnace as an exact duplicate of the Torrid Zone is calculated to mislead as to its origin, and is likely to produce confusion and deceive the ordinary purchaser.

"(5) Because the construction of the Ideal furnace

is of such similarity to the Torrid Zone furnace as that one may readily be mistaken for the other."

We have not attempted to set out all the circumstances relied upon by appellee which they claim tend to show unfair competition, but enough has been referred to as to the methods of defendant to show unfair competition, and that the order of the district court granting a temporary injunction was justified.

2. INJUNCTION: scope of relief: competition.

2. One other point should be noticed briefly, though the points already decided are the ones most seriously argued. Appellant, in its reply brief, states that the vital question in the case is whether, under the circumstances shown in the case, the defendant is guilty of unfair competition. A further suggestion in regard to the scope of the writ as provided in the order as to the states named appellant argues in its reply brief: that plaintiff alleged in its petition that it had established a market in certain states. The argument is that plaintiff failed to show that it had established a market in these states; that its testimony only went to the fact that it had done business in these states; and they say that there are innumerable markets for furnaces in each state, and that plaintiff was only entitled to relief, if at all, in the particular markets in which it had established a reputation. But it seems to us that this clause, to wit, "in all other localities in which the plaintiff is advertising and selling its Torrid Zone furnace," was cured by the modified order as made by the trial judge, and, as we shall show later, appellee claims no more for the order or under it.

The further argument is that the provision of the order is indefinite and uncertain. As to the scope of the order, counsel for appellee say that the question raised by counsel for appellant is not involved in this case, for the reason that the question was not raised in the pleadings, in the

argument, or in the reargument of the case before the trial judge, and that appellant nowhere made any claim that appellee was attempting to restrain them from unfair competition in any state where appellee was not in fact doing business. We assume that counsel for appellee mean that the question as to the scope of the temporary injunction authorized by the order was not raised by the appellant. But the order was made at the end of all the proceedings. The plaintiff alleged that defendant was selling furnaces in territory previously occupied by plaintiff, and asked an injunction as to such territory. Counsel for appellee concede that there can be no unfair competition where there is no competition, and say they are not trying to restrain defendant from selling any furnace it may please and wherever it may please, so long as, in doing so, it does not engage in unfair competition with the appellee.

Counsel for appellee point out certain language in the case of Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 231 Fed. 550, at 555, a case cited by appellant, wherein the language of the decree was quite similar to the language complained of in the first order of the trial court in this case. That language was:

"Decree will be entered which will so restrain defendants in their ways of advertising, marketing, and selling their cream in Annapolis, in Laurel, and in any other places in which the plaintiff, prior to the institution of this suit, was selling its cream, as will remove all reasonable danger of defendant's cream being sold as plaintiff's, or under the reputation acquired by plaintiff."

Counsel for appellee state that they have never claimed the right to restrict the appellant from selling its Type "A" furnace, or any other furnace similar to appellee's Torrid Zone furnace, in any territory in which appellee has not engaged in business: in other words, where appellee has established no reputation for its furnace. They argue

that it would be impossible to make the injunction more specific, for the reason that no one can tell at this time just what new territory appellee may occupy in the future. They say that appellee's business is rapidly growing, and, if it should later enter into some new territory, as it probably will, it should be entitled to the protection of this injunction there the same as in the territory in which it is now engaged in business; provided, of course, the defendant shall not have already established a trade and reputation for its Type "A" furnace in that particular territory, wherever it may be. We may remark here that, as to such new territory, the trial court may conclude on final hearing that the decree should be left open for a further hearing. But, as stated, we think the first order made for the temporary writ was modified.

As before stated, the trial court, after reargument of the case, modified the first order, and referred to the case of *Sartor v. Schaden,* 125 Iowa 696, at 704 and 702, on the question of trade-marks and unfair competition, and quoted the following language from that opinion at the pages given, as follows:

"One is of necessity geographical and covers the entire limits of the jurisdiction of the sovereignty granting the right; and the other is of necessity local, not founded upon any authority or right from the state, but based upon usage in the particular locality or localities in which the party is doing or seeks to do business."

And:

"The use of the word in other states or in other parts of this state by persons who did not compete with plaintiff is not controlling on the issue of unfair competition, * * * and in many cases, if not in most, this competition is of necessity local."

And the court, in its modified order, stated that, under

this authority, it was apparent that the conclusion stated as to the breadth of the injunction should be modified; and then said, in the modified order:

"An injunction will issue as determined in the original opinion, and apply in all cases wherein the plaintiff is doing business,—that is, is selling its furnaces. This does not interfere with the right of the defendant to sell its furnaces in localities in which the plaintiff is not doing business."

We do not see why this does not meet the appellant's objection to the language of the first order before set out, which it is alleged is indefinite and uncertain.

It is our conclusion that the order appealed from was and is sustained by the evidence and the law, and it is, therefore,—*Affirmed.*

DEEMER, WEAVER, and EVANS, JJ., concur.

### SUPPLEMENTAL OPINION.

The writer of the opinion, and of this, believes the opinion is right, but is directed by the other justices to say that, this being a review of a mere interlocutory order, we are not now settling finally whether, on final hearing, defendant shall be enjoined from manufacturing or selling in any territory. In the meantime, the order below will stand as written. As so modified, the petition for rehearing is overruled.