**J. C. PENNEY CO. v. H. D. LEE MERCAN-
TILE CO.**

**H. D. LEE MERCANTILE CO. v. J. C.
PENNEY CO.**

Nos. 11726, 11727.

Circuit Court of Appeals, Eighth Circuit.
June 19, 1941.

952

Charles H. Mayer, of St. Joseph, Mo. (Floyd M. Sprague and Mayer, Conkling & Sprague, all of St. Joseph, Mo., and Gwinn & Pell, of New York City, on the brief), for J. C. Penney Co.

Charles M. Blackmar and Kenneth E. Midgley, both of Kansas City, Mo. (Michaels, Blackmar, Newkirk, Eager & Swanson, of Kansas City, Mo., on the brief), for H. D. Lee Mercantile Co.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge, delivered the opinion of the Court.

The questions for determination are whether, in adopting a certain bib-pocket design for its overalls, or in its methods of marketing the same, defendant has been guilty of unfair competition against plaintiff, and, if so, to what relief plaintiff is entitled by reason thereof.

The suit was one by The H. D. Lee Mercantile Company against J. C. Penney Company, for an injunction and for an accounting of profits and damages.[1] The trial court held that defendant had substantially copied or imitated the visual design of plaintiff's bib-pocket; that such design, through national and local advertising, had become symbolical in the public mind of Lee overalls; that defendant should be enjoined from using the design, "without so distinguishing its overalls, other than by labels, as to prevent the casual purchaser of overalls from being mistaken, confused or misled"; that it should further be enjoined from selling its overalls "in response to inquiries by customers for overalls manufactured by plaintiff, without specifically advising such customers that such overalls are not manufactured by plaintiff", and from doing anything "calculated or likely to cause the overall-buying public or trade to believe that the defendant's overalls * * * are in any way connected with the plaintiff"; and that the cause should be referred to a master for an accounting of profits and damages.

Defendant in effect has appealed generally from the decree, and plaintiff has appealed from the trial court's refusal to prohibit absolutely defendant's use of the bib-pocket design.

The design involved was a multiple or "four-in-one" pocket structure, with rounded corners, having an ordinary pocket at each end, fastened with snaps at the top; a pencil stall in the center; a watch pocket to the left of the pencil stall; and with the whole structure covering the greater portion of the overall bib. Defendant's design differed in minor respects from that of plaintiff, in that (1) the bottom was flat, while that of plaintiff was slightly pointed or shield-shaped; (2) the pencil stall was divided by a red-stitched buttonhole in the middle, so that it would accommodate either a short or a long pencil; (3) the shape of the pencil stall was rectangular and not tapering, like that of plaintiff; (4) the buttons on the snap-fasteners were enameled in blue or red with the word "Pay Day", while plaintiff's buttons were unenameled and bore the word "Lee"; and (5) on each of the two upper corners of the pocket structure and at the top of each side of the pencil stall were red bar tacks or stitches, while those of plaintiff were white.

[1] The case was removed from the state court to the federal court on diversity of citizenship. The questions presented are matters of common law, but both parties are relying upon federal precedents, and no variance is claimed between the local and general law.

But these, in our opinion, constituted mere "arguable differences" (Scheuer v. Muller, 2 Cir., 74 F. 225, 228), or "side-by-side" distinctions (Nims on Unfair Competition and Trade Marks, Third Edition, 844, § 326). They present a situation where "the differences are less observable than the resemblances," (Paris Medicine Co. v. W. H. Hill Co., 6 Cir., 102 F. 148, 150). In an action for unfair competition, in copying or imitating a design, the test to be applied is not the careful scrutiny of the discriminating purchaser, but the likely observation of the casual buyer, and hence the dominant traits of general appearance ordinarily will be regarded as controlling. Chesebrough Mfg. Co. v. Old Gold Chemical Co., 6 Cir., 70 F.2d 383, 385. The illustrations of plaintiff's and defendant's designs, set out below, serve to demonstrate the principle.

stood out so distinctively as to impress itself upon the consuming public's mind, without the need of special emphasis. In other advertisements the pocket was pointed out as only one among a varying number of overall features, in some instances up to fifty-five in number.

Plaintiff twice applied for a design patent upon the bib-pocket, but its applications were denied. The last refusal was apparently made in 1936, and it was shortly after this that defendant undertook to copy or imitate the design. The Oshkosh Overall Co. had adopted a somewhat similar design in 1935, except that it used square corners instead of round, and made part of its stitching with blue thread instead of white. Some time after the denial of plaintiff's second patent application and defendant's use of the design, it was adopted by other overall manufacturers also.

Defendant's pocket contained also a 1 x 1½ inch woven cloth label, sewed onto it, bearing the words "Super Pay Day—Sanforized Shrunk—Union Made—J. C. Penney Co.", but the effect of this label will be considered later.

Plaintiff had adopted its design in 1929. From 1930 to 1936, it had spent approximately $800,000 in advertising its overalls, through the columns of the Saturday Evening Post, The Country Gentleman, and various railroad and trade magazines, and by means of circulars, window displays, displays at state and county fairs, road signs, radio programs and various advertising novelties. In many of the advertisements, the bib-pocket was not specifically mentioned as a feature, but it is plaintiff's contention that the pocket

The testimony of some of the witnesses indicated that it had been the general practice in the overall industry for manufacturers to appropriate the unpatented improvements of each other. Thus, when Oshkosh Overall Co. introduced the "graduated rise" in overalls—which was a sizing of the garments to height as well as waist measure—the others adopted it, including plaintiff in 1936.

Such a practice is one of the privileges of our system of competitive enterprise. It insures to the public the benefit of all natural, useful progress in the industrial and commercial arts. Any article, structure or design, which is unpatented, may accordingly be imitated or appropriated in its functional aspects, if no unfair competition is involved in the manner of its

954

use. Unfair competition has its roots in unpermissible business practices or merchandising methods. In permitting unpatented functional features to be subjected to competitive commercial appropriation, the law treats a non-functional aspect of goods as constituting in effect a mere form of merchandising or a business method. The law necessarily and naturally condemns any method of merchandising which unjustifiably tends to deceive or confuse the public. And so, in competitive goods, the appropriation of a non-functional aspect will generally be regarded as an improper method of merchandising and prohibited as unfair competition, in order to prevent probable deception or confusion of the public in the market.

The first question necessary to be determined in the present situation, therefore, is to what extent the features of the bib-pocket design involved were functional or non-functional in nature.

■ "A feature of goods is functional * * * if it affects their purpose, action or performance; or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects." Restatement, Torts, § 742. But the term "functional" is not to be treated as synonymous with the literal signification of the term "utilitarian". A design, for example, may not be utilitarian in a technical sense, but it may nevertheless be functional in the sense that it will contribute materially to a general sale of the goods.

■■ The line is one that is not always easy of demarcation: If the design merely serves as a badge or identifying mark in the public mind of the source of the goods, it necessarily will be regarded as non-functional. Restatement, op. cit. § 742, Comment a. If, however, the public believes generally that a certain feature adds a utilitarian value to the goods—whether it actually does or not—and will be materially influenced to purchase them on that basis, over other competitive goods in the market, it will be held to be functional. In the absence of a patent or a controlling legislative regulation in the particular field, the public is entitled to free competitive production in every element of consumer's value. The court's dominant concern in such a situation is with the public, but, if that aspect of the matter is not clearly self-demonstrative, the competitive rights involved will be tested by "whether prohibi-

tion of imitation by others will deprive the others of something which will substantially hinder them in competition". Restatement, op. cit., ibid.

■ The bib-pocket design here under consideration seems to us to have a clear commercial appeal that goes beyond the aspect of merely identifying the garment or its source of production. Part of plaintiff's evidence naturally indicated a demand for the design as an identification of Lee overalls, but the testimony of most of the witnesses tended rather to establish a purchaser's interest in obtaining the features of the design, at the most advantageous price, without concern for the manufacturing source. A comparison of the previous Penney pocket design, which we have set out above, with that here involved, readily demonstrates its competitive appeal. The unity of the structure suggests a utilitarian value over separate pocket elements, that is more than a matter of mere appearance or of product identification. This includes the rounding of the pocket corners, since the evidence establishes that such pockets recognizedly accumulate dirt less easily than square ones. Round pockets have increasingly come to be employed in the overall industry, and plaintiff did not originate them. The fact that it might have been possible to give the consumer a substantially equivalent utility, by incorporating round linings in a square bib-pocket structure, could not operate to prohibit defendant from using a rounded pocket design, where the effect necessarily would be to make the casual purchaser believe that he was not obtaining round-cornered pockets, and where the acceptability of the garment would in consequence be substantially diminished. Nor do we regard as controlling, the statement of one of defendant's witnesses on cross-examination, that the utility features of the pocket could have been adopted without copying the actual design,—upon which statement plaintiff so strongly relies—since it is obvious that this had reference to the number, sequence and general utility of the pockets, and did not involve a consideration of the functional elements inhering in the unity and properties of the structure or in the legitimate desire of the public for the design itself without regard to its source or claimed symbolization.

■ Plaintiff, as we have indicated, had been denied a patent upon the bib-pocket design, and so was not entitled to

a monopoly upon any of its functional features. Plaintiff was able for a number of years to pre-empt the field and to capitalize upon the public demand for the design, by the threat that inhered in its pending patent applications. It is a reasonable assumption that, except for this threat, the design would previously have been adopted by other overall manufacturers, in accordance with their practice, throughout the history of the industry, of appropriating the improvements of each other. Doubtless the advertising expenditures of plaintiff, during the period that it was able to pre-empt and hold the field by reason of its pending patent applications, were a material factor in acquainting the public with the pocket design and in opening the market for it. But these expenditures could not purchase for plaintiff the equivalent of a patent monopoly, nor operate to deprive the public of the right to competitive production in a field of functional values. "Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73. "The public interest in competition ordinarily outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to purchasers." Restatement, op. cit., p. 622. Or, as Mr. Justice Holmes once stated it, while he was a member of the Supreme Judicial Court of Massachusetts, in a case where the defendant was accused of having copied the form of a zither, which plaintiff claimed to have designed and popularized, "The defendant has the right to get the benefit of that desire [of the public] even if created by the plaintiff. The only thing it has not the right to steal is the good will attaching to the plaintiff's personality, the benefit of the public's desire to have goods made by the plaintiff." Flagg Manufacturing Co. v. Holway, 178 Mass. 83, 59 N.E. 667.

But, it is contended that, even if defendant had a right to imitate or appropriate plaintiff's pocket design, it nevertheless was guilty of unfair competition, in failing to take adequate steps to protect the public against deception or confusion, and in attempting to palm off its overalls as those of plaintiff.

The right to imitate or copy the functional features of goods does not of course import the privilege of stealing the trade of the originator, through deception or confusion. Defendant could not under any circumstances sell its overalls as those of plaintiff, nor could it wittingly allow the door to be left open to probable public deception or confusion as a result of its imitation. Leschen & Sons Rope Co. v. Fuller, 8 Cir., 218 F. 786; F. W. Fitch Co. v. Camille, Inc., 8 Cir., 106 F.2d 635. It owed the duty of identifying its product in a manner that would reasonably distinguish it from that of plaintiff, or, in other words, of using all practical means available, to prevent confusion in the trade. Kellogg Co. v. National Biscuit Co., supra; Moline Plow Co. v. Omaha Iron Store Co., 8 Cir., 235 F. 519.

In Restatement, Torts, § 741, Comment j, the rule is stated thus: "If an imitated feature is functional but has also acquired generally in the market a special significance as an indication of the source of the goods, the imitation is privileged if it is accompanied by reasonable effort to avoid deceiving prospective purchasers as to the source. This may frequently be done by prominent disclosure of the true source. At other times, additional notice may be necessary. What steps are reasonable depends upon the circumstances of each case. If they cannot be taken as a practical matter in a particular case, they are not reasonable in that case. If they are not calculated to avoid deception of customers, or if they would involve a financial expenditure which would substantially hinder competition in the sale of goods, they are not reasonable. And if there are no reasonable steps to be taken in a particular case, the feature may be imitated despite its special significance."

The trial court held, as we have indicated above, that defendant could use the pocket design only if it so distinguished its overalls, "other than by labels, as to prevent the casual purchaser of overalls from being mistaken, confused or misled." Defendant insists that its labels fully satisfied the duty resting on it to explain or give notice of the source of its goods; that they were all that it was reasonably and practicably possible for it to do under the circumstances, to avoid any probability of confusion; and that to require it to distinguish its overalls other than by label would in practical effect require it to change the form of the design and deprive it of some legitimate element of competitive appeal.

Labeling is the usual and accepted method of distinguishing the goods of one manufacturer from those of another in the

market. Its practical efficacy is sufficiently attested by the universality of its use. Even plaintiff specifically attempted to emphasize to its customers, in part of its advertising, to "Look for this (Lee) Label on the Overall."

█ █ Full, fair labeling will generally speaking be held to satisfy the duty of identification in the broad field of competitive functional features. Where, however, such features have acquired a special significance as an indication of the source' of the goods,—commonly referred to as a "secondary meaning"—and it appears that other reasonable steps can practicably be taken to distinguish the goods in a particular case, the court obviously may require that this be done. If nothing except a prominent disclosure of the source of the goods by label suggests itself as a reasonable and practical step in a particular case, this necessarily must be held to be sufficient to permit the use of the functional features, despite their special significance. Restatement, op. cit., ibid.

█ Here, the trial court has decreed that defendant must distinguish its overalls from those of plaintiff by some means other than the use of labels. It is not suggested what other reasonable and practical means were felt to be available for this purpose, and none is apparent to us from a reading of the record. Under the circumstances, the trial court's order, though in form confirming defendant's right to use the bib-pocket design, would in practical effect, as we view it, require defendant to make some change in the style of the design, that would deprive it of .part of its competitive appeal. In this situation, a prominent and appropriate labeling of defendant's overalls must be held to constitute a sufficient explanation and notice for purposes of distinguishing them generally from the goods of plaintiff, in the market.

We turn accordingly to an examination of the sufficiency of the form and content of the labels which defendant has employed. The bib-pocket, as has previously been pointed out, contained a 1 x 1½ inch cloth label, sewed onto it, in which the following words were woven in color:

"Reg. U. S. Pat. Off.
Super
Pay Day
Sanforized Shrunk
Union Made
J. C. Penney Co."

The overalls cointained also a 4 x 6 inch colored paper label, backed with cloth composition, which was sewed immediately above the right rear hip pocket, and on which was printed in large letters the words "Super Pay Day" and "Sold only by J. C. Penney Company, Inc." The record shows, without dispute, that defendant's overalls were always kept for sale with the large label appearing on the outside and on top of the folded garment.

It should be noted also that the situation is not one of a sudden entry by defendant into the overall business, with an attendant effort to open up an immediate market for its garments. Defendant had been marketing overalls since 1917—which was prior to plaintiff's advent into the overall manufacturing business. Its garment sales at the time it adopted plaintiff's bib-pocket design were greatly in excess of those of plaintiff. In 1936, defendant had sold over 2,200,000 pairs of "Super Pay Day" overalls, as compared with sales by plaintiff of approximately 1,700,000 pairs of its "Lee 91" garment. Both brands enjoyed a national reputation, and each producer necessarily had a just pride in the public recognition of its garments. Obviously, the good will which defendant had built up for its product over a twenty-year period would constitute a far more valuable factor in its future trade than would an attempted burial of the identity of its garment in a simulation of plaintiff's overalls. It is a natural assumption therefore that defendant was interested in preserving the identity of its product in the public mind, and this it seems to us it effectively sought to do by a continued use of the labels with which its garments had been previously marked and distinguished. Incidentally,—though it is without particular significance—the record does not contain direct testimony on the part of the consuming public to indicate that the labels of defendant did not effectively serve to identify and distinguish the source of the garment. In addition, it appears that defendant's overalls were not sold by retailers generally, but only in the stores which defendant itself operated.

█ Under all the facts of the situation, we hold that the form and content of the labels in this case and the manner in which they were displayed on the garment, together with the fact that the overalls were sold only in defendant's own stores, afforded the public such explanation and notice as it was reasonably and practicably

necessary and possible to place upon the garments, as a protection against probable deception and confusion in source identification. We do not believe that a casual purchaser, reading the label, "Sold only by J. C. Penney Company," in a store of defendant, would be likely to suppose that he was buying a Lee overall, nor, as we have indicated, is there any evidence in the record that would tend to create such an impression in our mind. It may be added that, if any doubt existed in the matter, the commercial fact of defendant's use of the labels over a period of years, in establishing the competitive identity of its own overalls in the retail market,—an identity which it quite obviously was as much interested in preserving even after the adoption of plaintiff's bib-pocket design as before—would probably testify more strongly to the general efficacy of the labels than our judicial impression.

There remains to be considered the charge that, even if defendant's labels were sufficient generally, as a means of source identification, defendant's clerks were guilty of attempting, in connection with individual sales, to palm off the "Super Pay Day" overalls as a Lee garment. Situations necessarily would arise where the transaction would be controlled by conversation and actions, and where the labels therefore could not be expected to be a factor in the sale. There was testimony by a witness for plaintiff that when he went into defendant's store at Chattanooga, Tennessee, to look at some overalls, he inquired, "Did Lee make these?", and that the clerk replied, "Well, we have all the industries around, manufacturers around, to make them." This statement was untrue, because the "Super Pay Day" overalls were all made, exclusively for defendant, in the plant of the Cowden Garment Co., in accordance with defendant's prescribed design and special specifications. The witness further testified that the clerk had left the impression on him that the overalls were made by Lee.

There was other testimony, also, that one of plaintiff's witnesses had gone into four scattered stores of defendant, in Missouri, Kansas, and Iowa, wearing a pair of "Lee 91" overalls, and, upon request for overalls like those he was wearing, had been shown a "Super Pay Day" garment, without any explanation that it was not a Lee overall.

 These purchases all appear to have been inspired by plaintiff, rather than to have constituted sales to the consuming public, but this fact is not controlling in determining whether defendant was engaging in the practice of palming off its garment as a Lee overall, if a suitable occasion and an apparent necessity presented themselves to do so. S. S. Kresge Co. v. Winget Kickernick Co., 8 Cir., 96 F.2d 978, 987. While one chance instance of attempted deception by an individual clerk of defendant would hardly be regarded as a sufficient foundation for an injunction against defendant's 1,547 stores, when several acts of unfair competition have been shown, there is warrant for concluding that they will continue, and equity may afford relief by injunction. Warner & Co. v. Lilly & Co., 265 U.S. 526, 531, 44 S. Ct. 615, 68 L.Ed. 1161; Barton v. Rex-Oil Co., Inc., 3 Cir., 2 F.2d 402, 406, 40 A.L.R. 424. It is to be borne in mind always that the test for the issuance of an injunction, to protect against deception in the field of unfair competition, is not simply whether casual purchasers have actually been deceived, but, equally, whether the situation shown is such that, if permitted to continue, it will probably lead to deception on the part of the consuming public, with resulting damages to the plaintiff. S. S. Kresge Co. v. Winget Kickernick Co., supra; Fuller v. Huff, 2 Cir., 104 F. 141; Ralston Purina Co. v. Checker Food Products Co., Mo.App., 80 S.W.2d 717. This rule has application, as much to acts of palming off, as to deception by general simulation.

 Here, sufficient facts have been shown to indicate, as we have pointed out above, that clerks in stores of defendant, scattered through four states, were willing to leave the impression with a customer that he was acquiring a Lee-made garment, if this was necessary to make a sale. Defendant, as we have held, was free to give its regular customers and the unattached general public the advantage of plaintiff's design, but to those, for whom the design had acquired a secondary meaning, it owed a special duty. Its clerks could not as to them make an evasive answer to a direct inquiry, nor could they remain silent in response to some expression that imposed an obligation to speak, where the answer made or the failure to reply could reasonably be expected to leave the impression with the customer that he was obtaining a Lee overall. In view of the fact that some degree of secondary meaning was involved, of which defendant was chargeable with notice under the facts in

the record, it seems to us that, if an actual wearer of a Lee overall asked one of defendant's clerks for a garment "like these", it implied an assumption, with nothing more said, that he would be shown a Lee overall, and was equivalent to a direct request for such a garment.

In this situation, defendant's clerk should be required to advise the customer, as the trial court held, that he was not being shown a Lee overall, such as he was wearing, even though the clerk might be at liberty to add that it possessed equivalent features. If it was merely the features which the customer desired, defendant would still make the sale. If it was a Lee garment that was wanted, defendant was not entitled to make a sale by a palming off of its overalls. Where acts of improper competition are shown, the courts will not hesitate to lend their aid to the fostering of commercial morality by an appropriate injunction.

On the record before us, however, plaintiff is not entitled to an accounting of profits and damages. An accounting of defendant's general profits, such as appears to have been granted by the trial court, would be clearly inequitable under the circumstances. Since the vast volume of defendant's overall sales could not possibly have rested on incidents of palming off, and since, as we have held, the adoption of the bib-pocket design itself did not constitute unfair competition, the proceeds of defendant's sales generally could not constitute a trust in favor of plaintiff. Nor are the acts of palming off shown such as to entitle plaintiff to a limited accounting of either profits or damages. The instances of palming off proved were not instances of actual customer deception. Including the incident at Chattanooga, they were manifestly transactions designed to furnish evidence for plaintiff. They were sufficient to entitle plaintiff to an injunction, so that probable deception of actual customers would not occur. But, in order to subject defendant to the burden of a reference, plaintiff was required to satisfy the court of its ability to establish some actual, material customer deception. The extent of the damages would necessarily be a matter for determination on the reference, but the certainty of damage must, as in any other case, have been foundationally established in the hearing before the court. In a case of unfair competition, the court will endeavor to adapt its relief to the general equities of the particular situation, as nearly as it is possible to do so. Compare Straus v. Notaseme Hosiery Co., 240 U.S. 179, 36 S.Ct. 288, 60 L.Ed. 590; Rushmore v. Badger Brass Mfg. Co., 2 Cir., 198 F. 379; J. F. Rowley Co. v. Rowley, 3 Cir., 193 F. 390; Restatement, Torts, Ch. 35, Introductory Note, p. 541 and § 745, Comment (e) and § 747, Comment (f). But equity will not delve into the realm of purely nominal damages.

The portions of the trial court's decree relating to defendant's right to use the bib-pocket design and ordering an accounting of profits and damages are reversed; the portion granting an injunction against any attempts to palm off defendant's overalls as those of plaintiff, and requiring defendant, in response to direct or equivalent inquiries for overalls manufactured by plaintiff, specifically to advise such customers that its overalls are not manufactured by plaintiff, are affirmed.

It may be added that the record indicates that defendant was able to retail its garments at approximately twenty cents less than those of plaintiff, and this is perhaps the main root of plaintiff's grievance. That is not a matter, however, with which we can be concerned here. Defendant's price scale was the same as it had been before it adopted plaintiff's bib-pocket design, and its overall prices were uniform in all its stores throughout the country. So far as the consuming public was concerned, the ability to obtain the bib-pocket design at a substantial saving was one of the advantages of its adoption by defendant. As a retail dealer, who was one of plaintiff's witnesses, testified, some of his customers had declared that "it looked to them like the Penney overall was just as good as the Lee, and less money, and they were going to buy it." In the absence of a legislative entry into the field of general price control, the public is as much entitled to the benefit of fair competition in prices as in any other consumer's element, and it is perhaps much more vitally and directly interested in it.

Reversed in part, affirmed in part.