**STEWART PAINT MFG. CO., a corporation, Appellant,**

v.

**UNITED HARDWARE DISTRIBUTING CO., a corporation, Appellee.**

**No. 15712.**

United States Court of Appeals
Eighth Circuit.

March 25, 1958.

Arthur S. Caine, Minneapolis, Minn., for appellant.

Wright W. Brooks, Minneapolis, Minn., (Faegre & Benson, Minneapolis, Minn., with him on the brief) for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The suit is one for an injunction against trademark infringement and unfair competition. Jurisdiction is without diversity basis, and so rests entirely on 28 U.S.C.A. § 1338 and 15 U.S.C.A. § 1121. The trial court, on opinion reported in 141 F.Supp. 638, denied appellant any relief.

■ Appellee says here that the case involves no issue as to the validity of appellant's trademark. It further states that no question exists as to the court's power to deal with appellant's claim of unfair competition, thus conceding that the claim of infringement is substantial enough and sufficiently related to the circumstances of the claim of unfair competition to support federal jurisdiction as to the latter. See 28 U.S.C.A. § 1138; Hurn v. Ousler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148.

From our examination of the record, we agree with and accept these viewpoints. The two questions therefore call for no discussion, and the expressions of doubt engaged in by the trial court with respect to them shall be without significance or effect in the litigation or otherwise.

■ Appellant is a manufacturer of paints, enamels and varnishes. It sells its products to retail dealers and, for its highest grade thereof, uses as an identification the trademark "Flint-Top". This mark had been long employed and advertised by it, and in 1951 registration was made thereof as a trademark under the Lanham Act, 15 U.S.C.A. §§ 1051–1127.

Appellee is a distributor at wholesale of numerous items of hardware stock, including paints, enamels and varnishes. It operates in the nature of a cooperative, in that it sells its goods only to dealers who are stockholders in it. It has all of its goods manufactured for it by others but uses for them its own general brand of "Hank's". Thus, the labels on its paint carry the words "Hank's Paint".

Before the present suit, however, appellee had also been placing upon the labels of its paints, enamels and varnishes, as an intended mark therefor, the term "Agate-Top". Relatedly, it made use too of the exact shades of color which appellant employed for its "Flint-Top" products. These shades are shown by the record to have been arrived at by appellant on substantial expenditure and experimentation in searching for customer appeal. Appellee had thereafter copied them. In addition, appellee placed upon its labels the artificial names or designations which appellant had devised for these shades. It further set out on its labels the serial or code number which appellant had ascribed to each particular paint and shade, except that it prefixed the numbers with the digit "1".

To give a concrete illustration—appellant used, on the label for a specific type and particular shade of paint, its registered mark "Flint-Top", the color designation "Flame", and the serial or code number "676"; and appellee used, on its label for the same composition and shade

of paint (appellee admitted that the formula and color were identical with, and had been copied from, appellant's paint), the indicating mark "Agate-Top", the color designation "Flame", and the serial or code number "1676".

It is true that these elements were not made to appear in exactly the same position on the labels; nor were the labels of the same color or design. Also, of course, appellee's labels contained the words "Hank's Paint" for general branding purposes. On appellee's color charts, however, which it supplied to its dealers to enable customers to make selection, comparison, or verification of their paint desires, the three elements referred to appeared in the same relative position, with the same relative prominence, and in similar relationship to the (identical) color chips used, as on the charts of appellant.

All of these factors are contended by appellant—and properly so, we think—to be entitled to a closer scrutiny and consideration for purposes of the specific situation, both on the question of trademark infringement and unfair competition, than it might perhaps be necessary to accord them generally, because of the privity which had existed between appellant and appellee prior to the acts complained of, and the special significance which appellee's conduct could have in the light of this relationship.

Prior to 1952, appellee had not carried paints, enamels and varnishes as part of its "Hank's" line of goods. That year, after negotiation, first with another paint manufacturer and then with appellant, appellee entered into an oral agreement with appellant for the supplying to it by appellant of the latter's regular paints, enamels and varnishes, with the right to distribute them under its "Hank's" brand and label. Appellee thus came to have available for distribution in the "Hank's" system the same paints and the same color shades therefor, which appellant was engaged in distributing to other retail dealers. As incidents in this supplying of its regular paints, appellant allow-

ed the same designations or names for the shades to be used on appellee's label, as well as its code numbers therefor, except that it requested that the numbers should be prefixed with the digit "1".

As to its trademark "Flint-Top", however, appellant chose not to allow appellee to use the identical term, but coined and suggested the term "Agate-Top" as a substitute therefor. On the trial, appellant claimed that, in making suggestion of the term "Agate-Top", it was intending to provide appellee with a mark of corresponding psychological impact to its trademark "Flint-Top", and of such similarity as to constitute a part of the general chain of relation and indication which it felt inhered in its supplying of its regular paints and shades, with a consent to the use of its devised color names and code numbers therefor—all of which it was willing to have exist on this controlled basis, but only on such basis.

It was shown, by undisputed testimony and by color charts collected generally throughout the industry (several hundred such charts being produced in court and use being allowed by the court of a representative selection therefrom), that paint manufacturers did not engage in the using of each other's color shades for their products but instead devised shades, names and code numbering systems therefor of their own. The evidence did not, however, compel the conclusion that this was done because of any ethical recognitions which had come to have the status of a competitive principle in the industry. The trial court was entitled to believe that the practice rather had the basis simply that each manufacturer desired to have his own distinct shades as a means of creating customer appeal and attempting to gain competitive advantage.

But the testimony does appear to leave no question as to the fact that, by reason of paint manufacturers' non-use of each other's shades, names and numbers, with the identification capable of arising therefrom, professional painters, at least in some measure, would make purchases and call for the paints they desired by

the manufacturer's shade names and code numbers. Relatedly, it also is clear beyond question that appellee's dealers had all been informed, at the time it added paints to its line of "Hank's" goods, that the paints were being manufactured by appellant and were the same as appellant's regular products. Thus, appellee's dealers were provided with the means, in conjunction with the color charts furnished them, of advising or persuading the professional trade, as well as other customers who might be interested in the fact, where this would be advantageous, that they were selling appellant's products, under the "Hank's" label, with the same shades, color names and code numbers (prefixed by the digit "1"), which appellant used for its products. However, this situation could properly be regarded as necessarily having been contemplated by appellant, as an incident of the elements of relationship which it had seen fit to create between appellee and itself, so long at least as such privity existed.

But when, after the expiration of approximately two years, appellee notified appellant that it was terminating the contractual relationship between them, it then entered into an arrangement with another paint manufacturer (Minnesota Paints, Inc.) to supply it with paints, not of such manufacturer's regular products, shades, color names and code numbers, but with paints which were to be prepared on an analysis and duplication of appellant's formulas, and with a using for such paints of the same shades, color names, code numbers, and the "Agate-Top" mark, as appellee had been having the benefit of under its relationship with appellant. The reason for thus changing manufacturer, appellee said, was that it was able to obtain a better price from Minnesota Paints, Inc. than that at which appellant was willing to continue to supply its paint products.

When the switch to Minnesota as a manufacturing source was made, appellee notified its dealers of this fact, and apparently also sought to give the assurance that this would not involve any change in the paint itself. Thus, in a bulletin to its dealers, it commented on the "tremendous job" which had been done in selling "Hank's Paint" and added the statement that the paint was being "made under our own formula which is as good as any top grade paint in the market". It urged that the dealers should thereafter undertake to "sell Hank's Paint on its own merit" and "not go into a long drawn out explanation—who makes it— and that it is similar to some other nationally known brand on the market that sells for a lot more". It suggested that they "not bring Minnesota into any of our talks" or "into the deal in any form whatsoever"; that Minnesota was, of course, continuing to market its own line of paints, and "in a way we're competing—but as long as we're working together, let's be friendly competitors"; and that the question of who made appellee's paints should be regarded as "irrelevant to the consumer", since "Hank's Paint can stand on its own feet".

At the time of trial, appellee's paints were being sold in 251 stores, through the same general trade area where appellant had dealers. Twenty-five of such stores were located in identical cities or towns with appellant's dealers. Nine of appellant's dealers had been induced or had seen fit to cease their handling of appellant's paints, and to take on the "Hank's" line. The record further suggests that other such dealers similarly were being made the subject of solicitation for appellee's benefit. All of this had occurred after appellee's termination of its contractual relations with appellant.

There is nothing, however, to indicate objectively how much of a factor it had been, in causing such dealers to take on "Hank's" paints in place of appellant's, that appellee was retaining the use of appellant's formulas, shades, color names, and code numbers, as well as the mark "Agate-Top". But the record does show that dealers of appellee had, in at least 11 proved instances, after appellee's switch to another manufacturer, made use of the fact that these things had been

retained, to palm off appellee's paints on purchasers who made requests for appellant's products.

In each of these instances, request had been made by the purchaser for a "Flint-Top" paint, of a particular shade name and code number, and the dealer in response to the request had produced a can of "Agate-Top" paint, of the same shade name and code number (prefixed by the digit "1"). In some cases, the dealer had told the purchaser, "This is what you want". In others, on remark by the purchasers that the cans produced bore the mark "Agate-Top" instead of "Flint-Top", the dealers had stated that the paints were "the same" or "exactly the same". One or two had specifically declared that the paint was appellant's product.

While all of these purchases had been inspired by appellant, that fact would not prevent the transactions from serving as probative demonstrations that palming off had been and would be likely to be engaged in, by virtue of the things which appellee had appropriated from appellant on termination of their relationship, if a suitable occasion and an apparent need so to do arose. Cf. J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949, 957.

The elements and circumstances which have been detailed seem to us plainly to demand the holding, as a matter of law, that both trademark infringement and unfair competition had existed in the situation.

■ Trademark infringement is, of course, a question which reaches beyond mere facial comparison of the marks and labels involved. Sometimes the deceptive tendencies of an alleged infringing mark will come into convincing focus only against the background of the conditions and incidents which have attended its use in the specific situation. See Walgreen Drug Stores v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956, 963; Coca-Cola Co. v. Carlisle Bottling Works, 6 Cir., 43 F.2d 119, 121; Hemmeter Cigar Co. v. Congress Cigar Co., 6 Cir., 118 F.2d 64, 69; La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 117.

Thus, identicalness or close similarity between the aspects of use of a registered trademark and another mark may serve to point up infringing conflict as to the situation involved, where under other conditions and incidents of use this might perhaps not be so. Such a using of perspective for purposes of the question of registered trademark infringement is, however, concerned only with the matter of obtaining viewing light and not with any appraising of, or leaning on, the significance of these aspects as matters of unfair competition otherwise.

Here, on the part which the record shows that individual color shades played in customer appeal, some of such value as the trademark "Flint-Top" could possess in commercial identification would necessarily, we believe, come to have association to the special and artificial color names which appellant used as to its "Flint-Top" paints. Especially does this impress as being true, because of the trade fact that paint manufacturers had not been engaging in the use of each other's paint shades and color names therefor but had always sought to establish such an individuality of their own.

A similar associational aspect in the use of appellant's trademark "Flint-Top" would also be capable of arising from the numbering system adopted by it for its paints, in that, as mentioned, professional painters were shown to some times call for paints by their code numbers. We should think it realistically incapable of dispute that in so doing the interest of this particular class had extended to brand or manufacturing source of the paint they were purchasing, and that their use of the code numbers rested on the associationship which they attached thereto.

In thus bringing the use of the terms "Flint-Top" and "Agate-Top" into relief for infringement appraisal, it is not necessary that the elements and incidents discussed should have attained the technical stature of secondary meaning for

appellant's mark. Circumstances of use are, of course, capable of creating secondary meaning and so adding to the scope and value of a trademark. But even without such a status, they may, as here, provide perspective for viewing the commercial significance and competitive reality of a trademark as it stands.

In the perspective of appellee's appropriation of the identical composition of appellant's paints, the identical shades thereof, the identifical artificial names therefor, and the identical system of code numbering except for a prefixing of the digit "1", instrumented by its providing of similar general color charts containing identical color chips and having the color names and code numbers correspondingly positioned thereon, it would seem to us that the contribution which appellant's trademark "Flint-Top" would be capable of serving, and which appellant was legally entitled to have it serve, in identification or suggestiveness for customer purpose, could be but little different, and hardly casually distinguishable, from the contribution which the term "Agate-Top" was expected to add in this same combinational situation as a competitive factor.

Both "Flint-Top" and "Agate-Top" are terms that have a conjuration beyond the natural ingredients or the general characteristics of paint. Their appeal is to the qualities of an outside substance. They therefore constitute primarily suggestive terms. Cf. Dietene Company v. Dietrim Company, 8 Cir., 225 F.2d 239, 243. And the suggestiveness which they are both intended to convey is of the same general quality of outside substance. Also, this artificial quality is in both marks attempted to be slid into immediate and corresponding paint association by the conjoining of the word "Top", so that a casual customer's attention would not be likely to linger in differentiating halt between the words "Flint" and "Agate".

We think that, from the nature of the mark and the setting of its use, appellee's employment of the term "Agate-Top"

constituted in the situation an infringement of appellant's registered trademark "Flint-Top", in that it could have the capacity to mislead or confuse the public, within the domain in which a registered trademark has the right to operate. The Lanham Act crystallizes this general ground into more specific language and forbids any "colorable imitation" of a registered mark, except with the consent of the registrant (which here existed until appellee's termination of the contractual relationship). See 15 U.S.C.A. §§ 1127 and 1114.

Appellant is entitled to an injunction against the infringement in which appellee has been engaging by its use of the mark "Agate-Top".

Beyond this, as we have said above, we think that unfair competition also has been committed against appellant, extending beyond the infringement of its trademark, which too properly is subject to an injunction against appellee.

Appellee had, of course, an abstract right to use whatever composition, shades, names and numbers it desired for its paints, as a matter of arms-length competition, where no secondary meaning could be said to be involved as to these elements. Possibly as to unpatentable compositions and as to colors, in the paint field, no secondary meaning could come to exist which the law would recognize.

As to artificial shade names and co-numbering system, a secondary meaning might come to exist and would probably be given legal recognition under sufficiently compelling circumstances. A possibility of this aspect is suggested, but not fully developed, by the showing in the record, referred to above, that shade names and code numbers were some times used by professional painters in making their purchases.

Without regard to this, however, and treating appellant's shade names and code numbers as not having acquired any general secondary meaning, we think it still constituted enjoinable unfair competition in the circumstances, for appellee, after

terminating appellant's supplier relationship with it, to have assumed to hold onto the merchandising advantage, which it had consentedly been permitted to enjoy in that relationship, of having its shades and types of paints identified and sold under appellant's artificial color names and code numbers.

If this advantage were one which served merely an internal business purpose, such as a personal convenience or facilitation to appellee in the handling of its paint stock or in the distribution thereof to its dealers, it would not be of such a nature as to entitle appellant to an injunction. Any such general, non-customer benefit to appellee, which appellant wanted to deprive it of on the termination of the parties' privity, should have been made the subject of an obligational requirement in the agreement. Appellant did not see fit so to protect itself. Nor was the agreement sufficiently definite to constitute one of a franchising or licensing nature, with such implications for total relinquishment as might be capable of inhering in that relationship.

But the parties did intend to create a situation in which both appellee and its dealers should be privileged to herald that what was being sold was appellant's regular products or "the same thing", and were to have the right to make use of appellant's shade names and code numbers to so identificatorily prove or for any other competitive purpose. Appellant's paint, in its quality and with these marketing incidents, had apparently so satisfied appellee's dealers that, as the bulletin sent out to them indicated, appellee thought that, by claiming appellant's formulas as its own and retaining all of appellant's adjuncts in relation thereto, "Hank's Paint can stand on its own feet".

This left appellee's dealers with the same means and opportunity as previously, for asserting tie to appellant's paint and for so identifying what they were selling. And the palming-off instances which have been referred to sufficiently demonstrate that appellee's dealers were aware of this fact and had and would thus use it, whenever need to do so arose.

In these circumstances it seems to us proper and necessary that appellee should be enjoined from the using of appellant's color names and code numbers on its paints and color charts, in the marketing by its dealers of its unrelated products.

Appellee contends, however, and the trial court was of that opinion, that no such general reach could be made against it and that appellant's relief must be sought against offending dealers individually.

This is not a situation where appellee's dealers are arms-length buyers and purveyors of its paints. They are organizationally members of appellee, and not on a naked stockholder basis, but for the specific purpose and as an essential requirement of using appellee's services, in the nature of a purchasing organization and privitous distributor for their mutual advantage. Increases in the sales of paint made by any dealer or dealers, by unfair means of competition, are of no less benefit to them in their group relationship and of no less furtherance of the competitive power of the "Hank's" system generally than are other increases in such sales. Moreover, the unfair competition shown to have been engaged in had a sufficient probative base to suggest the tendency and likelihood thereof generally and to indicate more than a maverick act emanating out of a wholly individual situation.

Beyond this, as we have stated, appellee's use of these things cannot rationally be regarded, we think, as having been done solely for internal business reasons, and without an eye on preservation for its dealers of all the elements of selling advantage which could have contributed to the "tremendous job" of merchandising which appellee acknowledged had occurred in its venture into the field of "Hank's Paint", with appellant's products. It is in any event plain that appellee had not wanted to take the risk of changing appellant's composition and shades of paint. In not changing any-

thing else, it also seems convincing that appellee further had been desirous of leaving the dealers with every other element of advantage which could have accrued to them out of its previous relationship with appellant.

The character of the relationship existing between appellee and its dealers and the object which it had of serving the advantage of the group are in our opinion sufficient as a basis for enjoining it from putting into the hands of the group such goods and means as were capable of being used by these dealers, and were likely to be so employed, to carry on unfair competition against the products of someone else.

▆ But apart from such a special relationship as exists in the situation, we have held generally that anyone who puts goods into the hands of dealers for sale to the public, which contain the means for deceiving purchasers, and which he can reasonably anticipate may be so used, is subject to injunction against the further providing of these means, to eliminate unfair competition against the goods of another, which has been or is likely to be engaged in by the dealers on this basis. Reid, Murdoch & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 817, 819–820.

The conclusions reached make unnecessary any consideration of the parties' other contentions. This includes a disregarding of appellant's attempt to have us declare that it is entitled to an accounting of profits and to damages, which relief appellant admits it did not request in its complaint nor otherwise seek to have made an issue in the trial court.

Reversed and remanded.

SANBORN, Circuit Judge (dissenting).

Whether the trade name "Agate-Top" as used by the defendant (appellee) was so similar to the plaintiff's (appellant's) trademark "Flint-Top" as to deceive or be likely to deceive purchasers and cause them to buy the defendant's paint in the belief that it was the plaintiff's product, was, in my opinion, a question of fact for the trial court, and not a question of law for this Court. See and compare, Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 418, 150 A.L.R. 1056. In that case we said that we would not, upon review, retry issues of fact or substitute our judgment with respect to such issues for that of the trial court. We also said that the power of a trial court to decide doubtful issues of fact was not limited to deciding them correctly, and that the weight of the evidence indicating that the product of a defendant, in a case such as this, had on occasions been sold for the product of the plaintiff, was for the trial court to appraise.

James E. Stewart, the president of the plaintiff, was asked at the trial what conduct of the defendant he considered unfair. His answer was:

> "We consider the use by the defendant of identical color shades and names and numbers, and their ordering of their supplier to furnish identical shades and color names and numbers to them, which they were formerly receiving from us as the main objection that we have entered here."

The conduct of the defendant in using the same color chart and same numbers, after the termination of its relations with the plaintiff, as had previously been used with the plaintiff's consent, has an element of unfairness about it, but I believe that that is not enough to justify a ruling that as a matter of law such conduct amounted to unfair competition. Under the evidence and the applicable law, I think the question whether the conduct of the defendant infringed the plaintiff's trademark rights or amounted to unfair competition was for the trial court to decide. I would affirm.