**PIEL MANUFACTURING COMPANY, Incorporated, Alfred J. Piel and Curry-Trol Oil Corp., Plaintiffs,**

v.

**GEORGE A. ROLFES CO., and Rolfes Manufacturing Co., Defendants.**

**Civ. No. 5–1250.**

United States District Court
S. D. Iowa,
Central Division.

Oct. 2, 1964.

Donald H. Zarley, Bruce W. McKee, Des Moines, Iowa, for plaintiffs.

Sherwin J. Markman, Des Moines, Iowa, Theodore R. Scott, James P. Ryther, Chicago, Ill., for defendants.

HANSON, District Judge.

Plaintiff, Piel Manufacturing Company, Incorporated, is an Iowa corporation located at Hubbard, Iowa. It was incorporated in 1959 and was preceded in business by a partnership, Piel Manufacturing Company, which was composed of plaintiff, Alfred J. Piel, and members of his family. Plaintiff Curry-trol Oil Corp., of Hubbard, Iowa, is also an Iowa corporation which was formed in 1959, and plaintiff Alfred J. Piel is president of both plaintiff corporations.

Defendants, George A. Rolfes Co. and Rolfes Manufacturing Co. are Iowa corporations located at Boone, Iowa, and George A. Rolfes is President of both corporations. Subsidiary Rolfes corporations exist in several midwestern states. Since about 1954, defendants have been manufacturing and selling grain aeration equipment and related items. The Rolfes Manufacturing Co. does the manufacturing of these products and sales are handled by the George A. Rolfes Co.

Plaintiff Alfred J. Piel is the inventor of record and owner of the patents in suit, namely, patent Nos. 2,813,510 and 2,794,422 on cattle oilers and rubbing elements therefor, respectively. Plaintiff, Piel Manufacturing Company, Incorporated, is the licensee under these patents.

Plaintiff Piel Manufacturing Company, Incorporated, is the owner by assignment from its preceding partnership of the trademark "Currytrol" and trademark registration No. 679,190 thereon, said trademark being used on cattle oilers. Said corporation is also the owner of the trademark "Currytrol" and registration No. 748,038 thereon for use on insecticide oil, and plaintiff Curry-trol Oil Corp. is a licensee under this trademark. Piel Manufacturing Company, Incorporated, makes and sells cattle oilers under its trademark, and the Curry-trol Oil Corp. manufactures and sells the insecticide oil sold under its licensed mark.

Of patent 2,813,510 (referred to as the 510 patent), only claims 1, 2, 3, 4, 5, and 12 are involved in this suit. These claims read as follows:

Claim 12 contains:

a) A tank.

b) A bearing frame mounted in the upper portion of said tank.

c) A cable operatively movably mounted on said frame and extending downwardly and outwardly in two directions.

d) A means for anchoring the two ends of said cable.

e) A liquid pump secured to said bearing frame and having

f) An actuating member.

g) A means operatively connecting said pump with the interior of said tank.

h) Said actuating member on said pump operatively connected to said cable.

i) A discharge conduit leading from said pump to a point in the vicnity of said cable.

Claim 1 of the 510 patent is substantially the same as claim 12 except that it calls for two spaced apart wheels rotably mounted on the frame.

Claim 4 of the 510 patent is the washers mounted on the cables.

Claim 5 of the 510 patent consists of the spring connected to the actuating member of the pump and it incorporates all of claim 1.

Claim 2 of the 510 patent modifies the structure of claim 1 by providing that the liquid discharge conduit leads from the pump to a point in the vicinity of the cable at a point between the wheels.

Claim 3 of the 510 patent defines the wheels of claim 1 as pulley wheels.

It is the claim of the plaintiffs that these claims of the 510 patent are infringed by the defendants and that the 510 patent is valid. Defendants deny the infringement and claim the 510 patent is invalid.

Piel made a few cattle oilers substantially the same as shown in the patent drawings. Later Piel developed Model 561 which used a single pulley wheel instead of two wheels shown in the patent drawing. Still later, Piel developed Model 601 which added a full sized cylindrical tank. It is this Model 601 which is involved in the unfair competition claim. Both Models 561 and 601 worked on the principle of a single cable.

The defendants claim that the original 510 patent under the doctrine of equiva- member on the pump to be operatively connected to the cable. Defendants also

claim that this was necessary to make the unit operative.

Defendants contend that because their machine does not have two spaced apart pulley wheels and because the actuating member on their pump is not connected operatively to the cable, their structure does not literally infringe the 510 patent and further that it does not infringe the 510 patent under the doctrine of equivalents.

Patent No. 2,794,422 (referred to as the 422 patent) is a liquid redirecting element located on the cables of the cattle oiler and is designed to reduce oil wastage by redirecting oil from the surface of the rubbing elements back to the cable. The 422 patent contains 9 claims and the defendants are charged with infringing claims 1, 2, 5, 6, 7, 8, and 9.

The elements of claim 1 of the 422 patent are:

a) A cable adapted to be supported at its ends in an inclined relation with respect to the ground.

b) Said cable having intermediate its length at least one liquid redirecting unit.

c) And washer-like means on said cable in engagement with opposite sides of said unit to hold said unit against movement along said cable.

Claim 2 of the 422 patent incorporates claim 1 and adds a spool having an open well at one end thereof receiving a portion of the washer-like means and a communicating bore embracing the cable.

Claim 5 of the 422 patent contains the following elements:

a) A cable adapted to be supported at its ends in an inclined relation with respect to the ground.

b) Said cable having intermediate its length at least one liquid redirecting spool unit comprising

c) an elongated body member having

d) an enlarged upper portion and

e) lower portion,

f) a bore in said lower portion embracing said cable,

g) an open well in said enlarged upper portion communicating with said bore and having a diameter greater than said bore,

h) and washer-like means on said cable in engagement with opposite sides of said unit to hold said unit against movement along said cable.

Claim 6 of the 422 patent incorporates claim 5 and adds the fins on the outer surface of the 422 structure.

Claim 7 of the 422 patent is very similar to claims 1 and 5.

Claim 8 of the 422 patent incorporates claim 7 and adds the feature that the lower end portion of one washer structure has an outside diameter less than that of the inside diameter of the top end of the washer structure. This allows the separate washer-like structures to fit together.

Claim 9 of the 422 patent includes claims 7 and 8 and adds the fins on the outside.

The defendants deny infringement of the 422 patent and claim that it is not a valid patent.

The defendants claim that the 510 patent is invalid because it was anticipated by the Assman patent and the combination of the Caldwell and Muzzy patents.

The Assman patent No. 2,762,335, issued on an application filed in the United States Patent Office in May 1955, and although there is some dispute in the evidence, the court finds that the Piel structure was not conceived prior to that time.

■ The court finds that the Piel 510 patent is invalid by reason of the prior Assman patent. The court further finds that the Piel 510 patent is invalid by reason of the Caldwell and Muzzy patents. The principal difference between the Assman patent and the Piel 510 patent is that the tank in the Assman patent is located in a different position. This does result in oil getting to the cables in a somewhat different manner. The difference, however, is not a patentable one. Especially is this so when other prior art taught the use of pump-

ing the oil up to the cables. The court does not feel that the plaintiffs' machine as disclosed in the patent eliminated lateral stress and that this at any rate would not make the machine patentable.

The Caldwell structure differs from the Piel 510 unit principally in that Caldwell used two cables and two pumps instead of one of each. The difference would not be patentable, but at any rate the other prior art, particularly the Muzzy patent, teaches the use of a single pump. Whether the prior art teaches the process of the patent to one skilled in the art is a question of fact. That distinguishes Ditto v. Minnesota Mining & Manufacturing Company, 336 F.2d 67.

In Caldwell v. Kirk Manufacturing Company, 269 F.2d 506 (8th Cir.), the court said the apparatus must reveal real inventive genius and not merely the skill of a mechanic familiar with the prior art. That court further said that novelty, utility, public acceptance, and the presumption of validity is not sufficient to make a patent valid. Novelty, utility, and public acceptance are strongly relied on by Piel in this case but it is not sufficient. The Caldwell case has been adhered to. See John Deere Company of Kansas City v. Graham, 333 F.2d 529 (8th Cir.). In Calmar, Incorporated v. Cook Chemical Company, 336 F.2d 110, the patent produced a long needed and desired advancement in the field. That is not so in this case.

The finding of invalidity of the 510 patent makes it unnecessary to decide whether the claims of the 510 patent are infringed. The court concludes that because of the crowded prior art in the field of cattle oilers, the doctrine of equivalents should not apply. This is not a situation where some of the elements of the patent existed in the prior art machines designed for different purposes than a cattle oiler, but here the elements are found in prior art machines which are used for the same purpose as the Piel machine, i. e., as cattle oilers.

The defendants claim that the Piel 422 patent is invalid as being anticipated by the Kirk patent if the 422 patent claims read on a device that redirects less than 100 percent of the oil. Defendants in the alternative claim that if the 422 patent does not read on a device that redirects less than all of the oil, the defendants' device does not infringe because it does not redirect all of the oil.

It is established in the evidence that the Kirk washers, the 422 apparatus, and the defendants' device all redirected at least some oil. The Kirk washers would not work as well in this regard as the 422 device, at least according to the evidence produced on this point. The 422 device is much more elaborate, but the fact remains it functions the same only better. This is true even if Kirk never claimed that his washers redirected the oil. The court cannot construe the claims of this 422 patent to cover a device that redirects less than all of the oil and still find it patentable over the Kirk patent. It only represents the skill of a mechanic improving an old device and does not reveal the inventive genius necessary to make a patent on it valid. Accordingly the court must conclude that the Piel 422 patent is invalid.

It is not necessary to decide whether the defendants' device infringes the Piel 422 device. The record would not support a finding that the defendants' device redirects the oil. If the 422 patent were valid, the infringement issue might be close.

On the issue of unfair competition, the defendants rely on Neely v. Boland Manufacturing Co., 274 F.2d 195 (8th Cir.) and J. C. Penney Co. v. H. D. Lee Mercantile Co., 120 F.2d 949 (8th Cir.). Since these decisions, the Supreme Court decided Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661, and Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. In the Lee case, the court said:

"Full, fair labeling will generally speaking be held to satisfy the duty of identification in the broad field of competitive functional features.

Where, however, such features have acquired a special significance as an indication of the source of the goods, —commonly referred to as a 'secondary meaning'—and it appears that other reasonable steps can practicably be taken to distinguish the goods in a particular case, the court obviously may require that this be done. If nothing except a prominent disclosure of the source of the goods by label suggests itself as a reasonable and practical step in a particular case, this necessarily must be held to be sufficient to permit the use of the functional features, despite their special significance."

In the Day-Brite case, the court said:

"That an article copied from an unpatented article could be made in some other way, that the design is 'nonfunctional' and not essential to the use of either article, that the configuration of the article copied may have a 'secondary meaning' which identifies the maker to the trade, or that there may be 'confusion' among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling."

The law may now be that secondary meaning can never have such importance as to require more than truthful labeling. Stiffel and Day-Brite are in point if plaintiffs' patents are not valid.

 The product of the defendants in the present case was truthfully and fairly labeled. The requirements of the Lee case and Chapter 548 of the Iowa Code, I.C.A. were met in this case because the product is truthfully and fairly labeled and the additional requirements rule does not apply to these facts. There is nothing to indicate that Neely intended to extend the Lee case. It is noticed that the Seventh Circuit decisions were at least somewhat relied on in the Neely case. The Lee case and the Neely case require additional precautions to be taken by the defendant where secondary meaning is present in the plaintiff's product. The court finds the plaintiff's design had no such secondary meaning which would require the defendants to do more than label truthfully even if more than truthful labeling can still be compelled after the Stiffel and Day-Brite decisions. Also, the Plaintiffs have not shown how the defendants could take additional precautions without changing its design. In the Day-Brite case, the court made it clear that design, functional or non-functional, can be copied and the fact that confusion or deception might result is not controlling.

The plaintiffs have not proven a cause of action under the Iowa law. In Johnson Gas A. Co. v. Reliable Gas Products Co., 233 Iowa 641, 10 N.W.2d 23, the court said:

"We do not deem it necessary to discuss the decisions of other jurisdictions except to point out that the writer of the A.L.R. note, above cited, states the general rule that 'the essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances.'

"The previous decisions of this court follow the above general rule. We said in the case of Motor Accessories Mfg. Co. v. Marshalltown Motor Material Mfg. Co., 167 Iowa 202, 149 N. W. 184, 186, that unfair competition 'consists in the conduct of a trade or business in such a manner that there is an expressed or implied representation that the goods or business of the one man are the goods and business of another. * * * The ground of the action of unfair competition is fraud, and this may be

shown by direct testimony, or by facts and circumstances or inferred from the manner in which the business is carried on.'

"The above rule was again approved in Lennox Furnace Co. v. Wrot Iron Heater Co., 181 Iowa 1331, 160 N. W. 356, 165 N.W. 395, where the defendant who imitated plaintiff's Torrid Zone Furnace was held guilty of unfair competition. But in the Lennox case it was conceded that the 'mere fact of imitation' did not make out a case. It was the duplication plus the marketing plan designed and executed to deceive ordinarily prudent persons into believing defendant's furnaces were plaintiff's that warranted the court in holding the plaintiff was the victim of unfair competition."

The Iowa court expressly refused to follow the Federal cases which would broaden its rule on unfair competition.

In the plaintiffs' Supplemental Memorandum, Columbia Broadcasting System, Inc., et al v. Documentaries Unlimited, Inc., 42 Misc.2d 723, 248 N.Y.S.2d 809, is cited for the proposition that the Stiffel and Day-Brite cases still allow a cause of action for "palming off." Justice Harlan's concurring opinion creates some confusion on that point. At any rate, the plaintiffs did not rely on palming off and have not proven any palming off in this case except where Mr. Davis sold one of his machines to fill an order for one of the plaintiffs' machines. This was not done by the defendants and was not shown ever to have been repeated. It is true that the recent cases may not have changed the Lee and the Neely cases. See the dictum in Stewart Paint Mfg. Co. v. United Hardware Distributing Co., 253 F.2d 568, 573 (8th Cir.). It is not now clear, however, that the plaintiffs must do more than truthfully label even if secondary meaning is present.

The plaintiffs are the owners of two federal registrations of the trademark "Curry-trol." One is on the insecticide oil and the other on the applicator device

called a cattle oiler. Plaintiffs allege that they began using this trademark on their cattle oilers and insecticide in 1956. Plaintiffs state in their brief that "the first cattle oilers were sold under the name 'cowshine' but shortly thereafter both the cattle oilers and the insecticide were sold under the name 'curry-trol', and the partnership registered this name in the United States Patent Office on May 26, 1959 * * *. The trademark 'curry-trol' for insecticide was separately registered on April 16, 1963."

Section 1052(e) and (f), Title 15 U.S. C.A. states:

"No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

"(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them, or (2) when applied to the goods of the applicant is primarily geographically descriptive or deceptively misdescriptive of them, except as indications of regional origin may be registrable under section 1054 of this title, or (3) is primarily merely a surname.

"(f) Except as expressly excluded in paragraphs (a)—(d) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

It is clear that the trade-mark registered in 1959 must be measured against Section 1052(e) because it does

not come within the exception in Section 1052(f).

Count II is directed to alleged infringement of the trade-mark "curry-trol" for use on the livestock oilers. Count IV was added by amendment and is directed to the trade-mark on insecticide.

The defendants contend that the plaintiffs' trade-marks are descriptive. "Descriptive words, lacking the distinctiveness of applying only to the producers of goods, were not eligible to become trade-marks under the common law." Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 199 F.2d 407 (8th Cir.); Beckwith v. Commissioner of Patents, 252 U.S. 538, 40 S.Ct. 414, 64 L.Ed. 705. "And words of description, absent a secondary meaning, have always been free to the use of anyone to describe the quality and character of his product." "But Congress has by legislation made not only the technical marks, good under common law, but also those which are descriptive but which have in addition, come to possess primarily the secondary meaning referred to, subject to registration under the law as trade-marks and entitled to the protection which the statutory law has provided." Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., supra. That decision was construing Section 1052(f) which still exists unchanged. The cases are not clear but compliance with Section 1052(f) is evidently the basis for the presumption of secondary meaning when a mark is registered in the principal register. It is not necessary in this case to decide that point since there is no secondary meaning and the presumption, if any, is rebutted.

■ Most of the cases hold that trade-marks such as "curry-trol" which are descriptive to a large extent and intentionally misspelled have been held valid only when it could be done on the basis of secondary meaning or suggestive meaning. The court finds as a fact that the trade-mark has no secondary meaning. The court also finds as a fact that the mark is descriptive because, absent secondary meaning, this type of mark is usually held descriptive.

■ Even if the trade-mark, because of secondary meaning or its suggestive nature, is not invalid as being descriptive, it is a weak mark and this has a bearing on the confusion or lack of it necessary to find infringement, e. g., American Foods, Inc. v. Golden Flake, Inc., 5 Cir., 312 F.2d 619, 624. To show the likelihood of confusion, mistake or deception of purchasers resulting from the use of the "Para-trol" mark by the defendants, plaintiffs rely on Stewart Paint Mfg. Co. v. United Hardware Distributing Co., supra, wherein the term "Agate-Top" was held to infringe "Flint-Top". That the Stewart case was close is shown by the dissent of Judge Sanborn.

■ It appears that the plaintiffs' arguments in support of trade-mark infringement might bring trade-mark law into conflict with Article 1, Section 8 of the Constitution which limits the right of Congress and the States to grant exclusive rights to discoveries in the same way that unfair competition law has conflicted with the authority in the Constitution to grant patents. Plaintiffs' argument makes copying the unpatentable product the essence of the trade-mark case rather than making the similarity of the marks the essence of the alleged trade-mark infringement. It would seem that the principle of the Stiffel and Day-Brite cases at least require the copying of the product to be less than controlling on a trade-mark infringement issue. It is only when the products are quite similar that there can be any trade-mark infringement at all so the similarity of the products is, of course, a part of a trade-mark infringement case as plaintiffs contend. See Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713.

■ Considering the plaintiffs' trade-marks as against the defendants' marks in the same type perspective as was used in the Stewart Paint case, this court finds as a fact that the defendants'

marking on its machines would not confuse or mislead the public. The court concludes, therefore, that there is no trade-mark infringement.

There is no evidence of actual confusion. If the plaintiffs are to have their trade-mark declared infringed, it would have to be done primarily because of the similarity in the machines and not the markings. In this case, it would be going so far as to do indirectly what the applicable law would not allow in an unfair competition claim. This court feels that the present case is more like Seven Up Co. v. Cheer Up Sales Co., 148 F.2d 909 (8th Cir.), wherein "Cheer Up" was found not to infringe "Seven Up".

The Stewart case is distinguishable from the present case in the following ways: (1) The trade-mark in the Stewart case was not shown to have had the wide use in the same particular field that the word "trol" has had in the agricultural field and thus the mark in the Stewart case is a much stronger one; (2) In so far as the marks in the present case are suggestive, they suggest different functions of the product instead of suggesting the same function as in the Stewart case; (3) the peculiar background of relationship which existed in the Stewart case is not present in this case; (4) The court found that there was palming off in the Stewart case; and (5) the characteristics of the product in the Stewart case were not shown to have been copied from the prior art whereas in the present case the color, the full sized tank, the rain cap, the type of legs and the type of support for the tank all existed in the prior art and were copied by the plaintiffs. The plaintiffs are now in a poor position to claim that these features were copied from them by the defendants.

Accordingly, there is no infringement of trade-marks and Counts II and IV will be Ordered dismissed.

Further, it will be Ordered that the plaintiffs' Complaint in its entirety will be dismissed.

The plaintiffs prosecuted this case in the utmost good faith and honesty in an effort to protect what they honestly felt their rights to be and the court will not exercise its discretion in granting attorneys' fees and costs and, accordingly, it will be Ordered that the request for attorneys' fees and costs is denied. Hanks v. Ross, 200 F.Supp. 605.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.